IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:12-CV-729-D

| | | |
|---|---|---|
| TERESA M. SPEAKS, TOBY SPEAKS, STANLEY SMITH, EDDIE BROWN, ROBERT POINDEXTER, MIKE MITCHELL, ROY L. COOK, ALEX SHUGART, H. RANDLE WOOD, ROBIN ROGERS, and DANIEL LEE NELSON, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| U.S. TOBACCO COOPERATIVE, INC. f/k/a FLUE-CURED TOBACCO COOPERATIVE STABILIZATION CORPORATION, | ) ) ) ) | |
| Defendant. | ) | |

On October 31, 2012, plaintiffs, on behalf of themselves and the class they seek to represent, filed a complaint against U.S. Tobacco Cooperative, Inc. (the "Cooperative" or "defendant") asserting claims for declaratory judgment, forced distribution of reserves, and judicial dissolution [D.E. 1]. Plaintiffs are members of the Cooperative and current or former flue-cured tobacco farmers. Plaintiffs contend that after Congress enacted the Fair and Equitable Tobacco Reform Act in 2004 and ended the Tobacco Price Support Program, the Cooperative's purpose ended and that the Cooperative should therefore be forced to distribute its reserves and be judicially dissolved. When the plaintiffs filed this federal complaint, a competing putative class action by a different group of Cooperative members was pending against the Cooperative in Wake County Superior Court (the "Fisher/Lewis" action). On December 5, 2012, the parties in this federal case moved to stay this case pending the outcome of a motion for class certification in the Fisher/Lewis action. See [D.E.

18]. On December 17, 2012, the court granted the motion to stay. See [D.E. 22].

The litigation in state court concerning class certification took longer than anticipated, and this court received updates from the parties in this action and granted a series of joint motions to stay. See [D.E. 23, 26–40]. On December 21, 2016, approximately three and a half years after the Wake County Superior Court granted the motion for class certification in the Fisher/Lewis action and after the Supreme Court of North Carolina permitted an interlocutory appeal of that order, the Supreme Court of North Carolina affirmed the order granting class certification. See Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp., 369 N.C. 202, 794 S.E.2d 699 (2016).

In early 2017, the parties in this federal case began discussing how to proceed with this case. On May 11 and 12, 2017, pursuant to this court's local rules which mandate mediation, the parties in this federal case participated in a hard-fought two-day mediation with the Honorable Frank W. Bullock, Jr., a distinguished, retired United States District Judge and certified mediator. After extensive negotiations, the parties in this putative federal class action entered into a $24 million proposed class action settlement agreement. See [D.E. 60-1]. On September 8, 2017, the plaintiffs moved to certify a settlement class and for preliminary approval of the proposed class action settlement [D.E. 60]. On September 13, 2017, this court entered an order preliminarily approving the class action settlement and scheduled the final fairness hearing for January 19, 2018 [D.E. 63]. On September 13, 2017, plaintiffs filed an amended complaint [D.E. 64]. Shortly thereafter, the parties designed and implemented an extensive notice program. The notice program cost approximately $1.5 million, and the Cooperative paid for the notice program pursuant to the settlement agreement. Meanwhile, the Fisher/Lewis action is ongoing in Wake County Superior Court, has proceeded through its own notice program, but has not proceeded to judgment.

On January 5, 2018, plaintiffs moved for final approval of the class action settlement [D.E.

2

216]. On January 19, 2018, this court held a final fairness hearing. See [D.E. 259]. At the fairness

hearing, this court heard arguments from plaintiffs' counsel, defense counsel, and the objectors. This

court has carefully considered all arguments made by plaintiffs' counsel, defense counsel, and the

objectors (including some who are represented by the lawyers representing the plaintiffs in the

competing Fisher/Lewis action). As often happens when there are competing class actions, these

lawyers are concerned about, inter alia, the preclusive effect that this proposed class action

settlement will have on the Fisher/Lewis class action. See Matsushita Elec. Indus. Co. v. Epstein,

516 U.S. 367, 373–87 (1996) (holding that a federal court reviewing a federal putative class action

must give preclusive effect under the Full Faith and Credit Act to a Delaware court judgment in a

competing class action in Delaware state court settling shareholders' claims under state and federal

securities law). This court thoroughly has reviewed the extensive record, including all objections.

As explained below, this court finds that the proposed class action settlement is fair, reasonable, and

adequate to all class members, and grants the motion for final approval of the class action settlement.

I.

A.

The Cooperative is a non-profit cooperative marketing association of flue-cured tobacco

farmers organized in 1946 under the North Carolina Cooperative Marketing Act (the "Marketing

Act"), N.C. Gen. Stat. §§ 54-129–54-166. Plaintiffs are, or have been, producers of flue-cured

tobacco and are currently members of the Cooperative. The Marketing Act seeks to

> promote, foster, and encourage the intelligent and orderly producing and marketing
> of agricultural products through cooperation, and to eliminate speculation and waste,
> and to make the distribution of agricultural products as direct as can be efficiently
> done between producer and consumer, and to stabilize the marketing problems of
> agricultural products . . . .

Id. § 54-129. The Marketing Act provides that an association has the power to "engage in any

3

activity in connection with the producing, marketing, selling, harvesting, preserving, drying, processing, canning, packing, storing, handling, or utilization of any agricultural products produced or delivered to it by its members and other farmers[,]" and to "establish reserves and to invest the funds thereof in bonds or such other property as may be provided in the bylaws." Id. §§ 54-151(1), (5). Since the Cooperative's inception, the Articles of Incorporation also confirm the Cooperative's powers "[t]o engage in any activity in connection with the marketing, selling[,] processing, manufacturing[,] or utilization of flue-cured tobacco . . . or the manufacture or marketing of products or by-products derived therefrom, or in the financing of any such activity," and vests the Cooperative's Board of Directors (the "Board") with the power to "enact and determine" its By-laws. [D.E. 229-2] 5–6, 8 (Article VII, X). Since the Cooperative's inception, the Cooperative's By-laws have empowered the Board to "conduct, manage[,] and control the affairs and business of the association," and "[t]o make and enter into agreements for the processing, manufacturing, warehousing . . . and marketing of the tobacco handled by the association or the products or by-products derived therefrom, including the leasing or purchasing of warehouses and other facilities," and to borrow money for "any corporate purpose[]." [D.E. 229-3] 5, 11 (Article III(a), (d), XV). Moreover, no evidence suggests that the stock certificates (e.g., [D.E. 73-29]) issued to each member, or any marketing agreement between the Cooperative and a member, have purported to limit the Cooperative's purpose or power.

From 1946 to 2004, the Cooperative's primary function was to administer the Tobacco Price Support Program. See Edward Kacsuta Decl. [D.E. 229] ¶ 12. The Tobacco Price Support Program was a federal price support program designed to stabilize tobacco prices for farmers. Under the program, tobacco farmers agreed to limit their production, and in exchange, the Cooperative would purchase from farmers all unsold tobacco at a guaranteed minimum price and then market the

4

tobacco to tobacco buyers. The Cooperative funded its purchases with loans from the Commodity Credit Corporation ("CCC"), an arm of the United States Department of Agriculture ("USDA"). Until 1982, the loans were "nonrecourse" and collateralized solely with the tobacco that the Cooperative purchased. The Cooperative processed and stored tobacco purchased under the Tobacco Price Support Program (the "loan tobacco") for the CCC's benefit. As the Cooperative sold the loan tobacco, it sent the proceeds to the CCC to repay the price support loans. However, because the loans were "nonrecourse," the CCC sustained losses on the loans in all years in which the Cooperative did not resell the tobacco above the guaranteed minimum price. These losses were borne solely by the federal government (i.e., the federal taxpayers) and not by the Cooperative or its members. See id. ¶¶ 13–14.

Although in most years the Cooperative lost money on the sale of its tobacco, the Cooperative realized a profit, after repayment of the CCC's loans, from its tobacco sales for the 1967–1973 crop years. See id. ¶ 15. The Cooperative distributed a portion of that profit to its members, and retained the remaining proceeds (approximately $26.8 million) as reserves. Id. ¶¶ 16, 19. In its December 1975 newsletter, the Cooperative's Board informed its members that it was building reserves to "maintain the viability of [the Cooperative] during periods of limited receipts and operations," and to "prepare for the rainy days." [D.E. 73-4] 1. The Board also informed its members that this was the first opportunity "to prepare to stand on our feet if that should become necessary." Id. No member of the Cooperative challenged the Board's decision to establish reserves at the time. See James Hill Decl. [D.E. 230] ¶ 13.

In 1982, Congress passed the No Net Cost Act which was designed to prevent taxpayers from bearing the losses from the Tobacco Price Support Program. See Strickland v. Flue-Cured Tobacco Coop. Stabilization Corp., 643 F. Supp. 310, 313 (D.S.C. 1986) (describing the legislation). The No

5

Net Cost Act required farmers to pay an annual assessment fee to the CCC on each pound of tobacco sold to protect the CCC against losses. The No Net Cost Act also required the Cooperative to cede any net gains realized on the sale of its tobacco to the CCC to cover prior and future losses. See Kacsuta Decl. ¶ 20. Between 1982 and 1985, the Cooperative collected the annual assessment fees owed to the CCC and held the assessments in a No Net Cost account that the Cooperative controlled. This financial arrangement created adverse tax consequences for members; therefore, in 1985, the Cooperative moved the money into an account that the CCC controlled. See id. ¶¶ 21–22. The money in the No Net Cost account did not belong to the Cooperative or its members, and the Cooperative did not use the money in the No Net Cost account for its own benefit. See id. ¶ 23; Charlie Batten Decl. [D.E. 232] ¶¶ 6, 10. Instead, the Cooperative served as a middle-man and collected the assessments for the CCC. See Randal Rucker Decl. [D.E. 233] ¶¶ 23, 36; see also Strickland, 643 F. Supp. at 313–15.

In 1986, Congress amended the No Net Cost Act to require tobacco buyers to pay annual assessments, and in 1993, Congress did the same with respect to tobacco importers. See Pub. L. No. 99-272; Pub. L. No. 103-66. Originally, the funds in the No Net Cost account could be used only to protect the CCC against losses, but Congress amended the statute to allow for other uses upon approval of the United States Secretary of Agriculture. See Pub. L. No. 98-180.

In 1990, the CCC agreed to apply the grower assessment fees collected from the 1982–1984 crop years to outstanding loans from the 1982 crop year. See Kacsuta Decl. ¶ 24. The CCC then released the loan tobacco from the 1982 crop year, and in a June 1990 letter, expressly told the Cooperative that the Cooperative "may retain the sales proceeds resulting from the sale of the remainder of the 1982 crop inventory once the 1982 loan account with the CCC is closed." [D.E. 217-2]. The Cooperative earned approximately $110 million from the sale of the 1982 crop year

6

tobacco. See Kacsuta Decl. ¶ 24. Similarly, in 1992, the CCC agreed to use money in the No Net Cost account, which had been collected in 1984 and 1986, to redeem loans provided in 1983 and 1984, and to release the unsold loan tobacco from the respective crop years. See id. ¶ 26.

The Cooperative knew that the Tobacco Price Support Program could not and would not last forever; therefore, as it had done in 1975, the Cooperative's Board elected to retain the proceeds from the sale of the loan tobacco as reserves so that it could continue to operate and support its members when Congress repealed the Tobacco Price Support Program. See id. ¶ 24. The Board informed its members of the decision to hold the funds as reserves, because, if Congress were to eliminate the Tobacco Price Support Program, the Board "would be in a position with surplus No Net Cost funds and reserves to operate a program to protect and stabilize the market for flue-cured tobacco growers." [D.E. 123-18] 3 (July 1990 newsletter). As in 1975, no member of the Cooperative challenged the Board's decision to hold these funds as reserves for future operations. See Kacsuta Decl. ¶ 27; Hill Decl. ¶ 25.

In the late 1990s to early 2000s, the Board became aware that Congress would likely end the Tobacco Price Support Program because the No Net Cost Act ultimately had failed to protect federal taxpayers from losses and because of public-health concerns about tobacco. See Hill Decl. ¶ 26; Andrew Shepherd Decl. [D.E. 231] ¶¶ 14–15. The Board also knew that the domestic market for flue-cured tobacco was declining and that the Cooperative needed to establish alterative business lines to serve its member-growers and to buy their crops each year. Thus, in June 2004, after receiving management's recommendation and deliberating extensively, the Cooperative purchased a tobacco manufacturing and processing facility in Timberlake, North Carolina. See Hill Decl. ¶ 26; Kacsuta Decl. ¶ 34; Shepherd Decl. ¶ 17. The Cooperative's 2004 annual report explained to members that the Cooperative purchased the Timberlake facility because it "must promote and sell

7

[its] own products if [it] want[ed] to continue producing tobacco." [D.E. 123-17] 5. The Timberlake facility would allow the Cooperative to become a "full service marketing cooperative" that would be able to produce and sell "tobacco strips, cut rag, puffed stems, and cigarettes under one roof." Id.

As the Cooperative and the Board foresaw, in October 2004, Congress enacted the Fair and Equitable Tobacco Reform Act ("FETRA") which ended the Tobacco Price Support Program. Under FETRA, flue-cured tobacco growers received a significant "buy-out"—i.e., payments—using funds collected from cigarette manufacturers. See Hill Decl. ¶ 27; Shepherd Decl. ¶ 20. The buyouts were pegged to the growers' respective quotas. Depending on the quota size, these buy-outs were often quite large, with some as high as a million dollars. See Hill Decl. ¶ 27; Rucker Decl. ¶ 24. FETRA also required the CCC to call its remaining loans. See Kacsuta Decl. ¶ 29. In March 2005, the CCC called these loans, took possession of the remaining funds in the No Net Cost account, and then applied substantially all of the money in the No Net Cost account to partially satisfy the outstanding price support loans. See id. The CCC also took possession of the tobacco that the Cooperative purchased with the CCC loans. See id. The CCC sold some of this tobacco and applied the proceeds to the outstanding loan balances. In 2005, after paying off the price support loans using the No Net Cost assessments and other sources of funds, the CCC released approximately 83 million pounds of tobacco to the Cooperative. See id. On March 21, 2005, the USDA told the Cooperative that it could use "these lots of tobacco in any manner that it desires." [D.E. 123-16] 2. The Cooperative booked this tobacco as an inventory asset and as "Contributed Capital" on its balance sheet and sold it for approximately $81 million. See Kacsuta Decl. ¶ 29. The CCC also transferred approximately $7 million of No Net Cost funds to the Cooperative for distribution to the producers. As directed, the Cooperative distributed that money to the producers.

8

See id. ¶ 30; Hill Decl. ¶ 28.

Post-FETRA, the Cooperative faced challenging decisions concerning how to best move forward and continue to support its member-growers and operations. At the time FETRA was enacted, the Cooperative had over 800,000 member-growers listed on its membership rolls. See Shepherd Decl. ¶ 23. Over 700,000 of the member-growers listed on the membership rolls were either deceased, had stopped farming by 1984, or had no financial relationship with the Cooperative. See id. ¶ 24. The Cooperative's Articles of Incorporation require member-growers to patronize the Cooperative in order to remain eligible members. See id. ¶ 23. Thus, the Cooperative's Board decided that it needed to clean its membership rolls so that it could have an accurate membership list to continue to help current member-growers. See id. ¶¶ 24–25. On December 20, 2004, the Cooperative notified its member-growers that they would have to sign either an exclusive marketing agreement or a non-exclusive marketing agreement to remain a member of the Cooperative for 2005 and future years. See Am. Compl. ¶ 32. Member-growers who did not renew their contracts with the Cooperative were removed from the Cooperative's membership rolls and paid $5.00 compensation to redeem their outstanding stock certificates. See id.[1]

In early 2005, the Board considered distributing capital to its members. See Hill Decl. ¶¶ 31–33. Management recommended that the Board not distribute capital and instead retain capital to allow the Cooperative strategically to deploy its assets to support its flue-cured tobacco member-

---

[1] Each member paid $5.00 to join the Cooperative and obtained a share of common stock that had "Common Stock at $5 Per Share" printed prominently at the top, along with specific terms specifying that a member's maximum claim upon the Cooperative, by virtue of owning common stock, would be limited to "the par or book value of such stock, whichever is less." [D.E. 73-29] (sample stock certificate) (emphasis added). The Cooperative had the same language in its governing By-laws and Articles of Incorporation. See [D.E. 229-2] (Articles of Incorporation); [D.E. 229-3] (1947 By-laws).

growers and the flue-cured tobacco industry in the new post-FETRA world. The Board extensively deliberated, and decided not to distribute capital, so that the Cooperative could execute this post-FETRA strategy. See id. ¶ 34.

Post-FETRA, the Cooperative sought to maintain and increase the price of tobacco, increase the amount of tobacco that it buys, and position itself to pay patronage dividends to its members. See Kacsuta Decl. ¶¶ 31, 55–57. To meet these objectives, the Cooperative's Board made numerous strategic decisions beyond the Timberlake acquisition. These decisions included: (1) expanding demand for flue-cured tobacco by seeking overseas customers, principally in Japan and in China, which is now the Cooperative's biggest customer (id. ¶ 35); (2) launching its own cigarette brand (i.e., "1839") (id. ¶ 36); (3) acquiring Premier Manufacturing, thereby allowing the Cooperative to sell more tobacco grown by its members and its own products and take advantage of a unique tax exemption in the Tobacco Master Settlement Agreement (id. ¶¶ 36–37); (4) building a green tobacco storage facility in order to increase yield from members' tobacco (id. ¶ 40); and (5) acquiring King Maker Marketing Inc., and various cigarette brands to sell member-grown tobacco in cigarettes that were previously manufactured in India. See id. ¶ 36. These initiatives, particularly the acquisitions, are expensive and require significant financing. See id. ¶ 45. Because the Cooperative no longer receives CCC loans, it had to find other ways to finance its operations. The Cooperative has a line of credit from a private bank, and the Cooperative may borrow up to $195 million against this line of credit at favorable interest rates. The terms of the loan agreement, however, require the Cooperative to possess substantial assets to serve as collateral. See id. ¶¶ 42–44. Thus, the Cooperative must use reserve funds and other assets to collateralize the line of credit and maintain compliance with its financing agreement. See id. ¶¶ 44–45.

The Cooperative currently has approximately $522 million in assets, $173 million in

10

liabilities, and $349 million in stockholders' equity. See id. ¶¶ 68–71.[2] The $349 million in stockholders' equity, however, does not represent the Cooperative's cash on hand. See id.[3] The Cooperative has approximately $11.5 million in cash or cash equivalents. See id. ¶ 71. Although the Cooperative has approximately $129 million in investments, these investments are used as collateral for the Cooperative's line of credit. See id. The Cooperative also has approximately $52 million in accounts receivable, which represents money owed to the Cooperative, not cash. See id. ¶ 72. The Cooperative's remaining assets are not readily liquid. See id. ¶¶ 73–77. Thus, because the Cooperative has only approximately $11.5 million in cash or cash equivalents, it will need to liquidate some non-cash assets to pay any settlement greater than $11.5 million. See id. ¶ 69.

Currently, the Cooperative's consumer-products business effectively subsidizes the Cooperative's unprofitable purchase of green leaf tobacco and sales of processed leaf tobacco. The Cooperative's unprofitable purchases of this tobacco directly benefit its member-growers by enabling them (post-FETRA) to grow more tobacco and to obtain a better price for it. See id. ¶ 47; Rucker Decl. ¶¶ 49–51. The Cooperative seeks to set an early, higher price for flue-cured tobacco, thereby raising the market price for its members and non-members. See Kacsuta Decl. ¶ 54. The Cooperative can pay these higher prices to its member-growers thanks to the profit that it earns through its non-leaf operations. See id. ¶ 50; Rucker Decl. ¶¶ 46–47. The Cooperative can maintain

_____

[2] These figures are from the Cooperative's April 30, 2017 audited financial statements. See Audited Financial Statements [D.E. 228-7] 6.

[3] In the years that the Cooperative elected to retain net profits as reserves, it credited (increased) the stockholders' equity account. See Kacsuta Decl. ¶¶ 24, 69. Stockholders' equity is a permanent account. This means that the stockholders' equity balance is an ongoing balance that is carried over from year-to-year and does not close at the end of each reporting period. Thus, because the stockholders' equity is carried over from year-to-year, the current balance does not reflect the Cooperative's current reserves or its current cash balance.

and grow its non-leaf operations thanks to the Cooperative's aggressive efforts to market its products, its leaves, and its flue-cured tobacco internationally. See Kacsuta Decl. ¶¶ 35, 51.

The Cooperative's post-FETRA strategy is working. Because of its consumer-products business, the Cooperative has been able to distribute patronage dividends to its members in recent years. See id. ¶¶ 55–56. From 2011–2016, the Cooperative paid $24.3 million in cash patronage dividends and issued a similar amount in equity credits. See id. ¶ 56. The Cooperative and its Board remain committed to maximizing the annual patronage dividends for member-growers while maintaining a sustainable business. See id. The Cooperative also offered the 1967–1973 Capital Equity Credit holders the chance to redeem their credits for cash. See id. ¶ 57. The redemption periods occurred between 2011 and 2017, and approximately $5.5 million of these credits were redeemed. See id.

The Cooperative and its Board face many challenges. For example, the Cooperative and its Board must decide how to allocate contracts among members who want to sell more tobacco than the Cooperative can afford to purchase. See id. ¶ 52. In making such challenging decisions, the Cooperative and its Board need to operate sustainably in order to benefit current and future member-growers. See id. By growing the overall market for its members' tobacco, and being able to finance such growth, the Cooperative seeks to increase the total poundage of annual leaf that it can contract to buy from its member-growers. See id. ¶ 53. If the Cooperative is forced to sell assets, it would have to attempt to renegotiate its credit agreement. Any renegotiation would yield higher financing costs and reduce the Cooperative's ability to purchase tobacco from its members. See id. ¶ 71.

B.

The Fisher/Lewis action was instituted on January 6, 2005, shortly after FETRA's enactment, when Dan Lewis and six other plaintiffs sued the Cooperative in Wake County Superior Court and

sought class-wide relief. Gary K. Shipman of Shipman & Associates, counsel for named plaintiffs in this federal action, originally was one of the lawyers representing the Lewis plaintiffs. On February 11, 2005, Kay W. Fisher and seven other plaintiffs also sued the Cooperative in Wake County Superior Court and sought class-wide relief. Charles Alan Runyan, current class counsel for the Fisher/Lewis class, and counsel for objector Pender Farms, Inc., originally represented the Fisher plaintiffs.

After voluntary exchanges of discovery, Shipman, on behalf of the Lewis plaintiffs, engaged in settlement discussions with the Cooperative. Thereafter, the Lewis putative class and the Cooperative reached a proposed settlement agreement for $76 million which the parties submitted to the presiding Wake County Superior Court Judge for preliminary approval along with a motion for class certification. On November 2, 2005, the court held the preliminary approval hearing. Attorneys representing the Fisher plaintiffs objected to the proposed settlement arguing, inter alia, that the Cooperative's Board had committed fraud, and that the proposed settlement did not adequately address the Fisher-plaintiffs' fraud claim.[4] The presiding North Carolina Superior Court Judge, took the proposed settlement agreement under advisement. On May 9, 2006, the presiding North Carolina Superior Court Judge denied "without prejudice" the preliminary approval and ordered the parties to engage in additional discovery. See [D.E. 70-2] 4–5. Thereafter, the parties engaged in additional discovery, but the parties could not reach a settlement.

_____

[4] Ironically, on February 6, 2017, Kay W. Fisher, lead plaintiff for the Fisher putative class, pleaded guilty in the United States District Court for the Eastern District of North Carolina to making material false statements and aiding and abetting in connection with a federal tobacco program in violation of 18 U.S.C. §§ 1001 and 2. See No. 4:17-CR-00001-D [D.E. 9] (E.D.N.C. Feb. 6, 2017). Fisher's criminal information, to which she pleaded guilty, details Fisher's prolonged fraudulent conduct between November 2009 and January 6, 2012. See id. [D.E. 1] (E.D.N.C. Jan. 3, 2017). Fisher currently resides in federal prison. See BOP Inmate Locator https://www.bop.gov/inmateloc/ (last visited Feb. 20, 2018).

13

In September 2007, Shipman & Wright (a successor law firm to Shipman & Associates) withdrew as counsel for the Lewis plaintiffs due to disagreements with co-counsel. At that time, counsel for the Fisher plaintiffs began representing the Lewis plaintiffs.

On May 15, 2009, plaintiffs filed a second amended and consolidated complaint in Wake County Superior Court, alleging causes of action for fraud, fraud in the inducement, breach of contract accompanied by a fraudulent act, conversion, breach of contract, imposition of constructive trust, accounting, distribution, declaratory judgment, ultra vires, unfair trade practices, dissolution, and judicial dissolution. On July 14, 2009, the Cooperative filed a motion to dismiss. On March 30, 2012, the Wake County Superior Court granted, in part, the motion and dismissed the fraud, fraud in the inducement, and breach of contract accompanied by a fraudulent act claims. On July 9, 2012, plaintiffs filed a third amended and consolidated complaint in Wake County Superior Court, dropped their claims for dissolution and judicial dissolution, and simultaneously filed a motion for class certification.

On October 31, 2012, a group of plaintiffs who disagreed about the litigation strategies in the Fisher/Lewis putative class action filed this federal putative class action [D.E. 1] (the "Speaks" action). Plaintiffs in the Speaks action asserted claims for declaratory judgment, distribution of reserves, and dissolution. See Am. Compl. [D.E. 64] ¶¶ 78–102. As factual allegations in support of their claims, plaintiffs allege that the net effect of the Cooperative cleaning its membership rolls was to "ensure that any Member who failed to enter into either an exclusive or non-exclusive agreement with [the Cooperative] would lose their interest in the substantial accumulated reserves of [the Cooperative], together with its retained earnings and margins, generated through the patronage activities of the Plaintiffs and other Class Members." Id. ¶ 34. Plaintiffs further allege that:

[N]one of [the Cooperative's] present activities, including but not limited to operation of the Timberlake Facility, necessitates its continued reserve or lack of allocation of millions of dollars that [the Cooperative] does not need to devote to its present activities. [The Cooperative's] present activities do not provide an adequate market, both as to quantity and price, so as to justify the Plaintiffs and other Class Members' continued participation as members of [the Cooperative], and in fact, puts [the Cooperative] in a position to compete with many of its members, by reason of those members' contracts with tobacco companies.

Id. ¶ 35.

As for the declaratory judgment claim, plaintiffs ask this court to determine whether FETRA eliminated the Cooperative's purpose, whether plaintiffs are entitled to a distribution of the Cooperative's reserves, whether plaintiffs are entitled to judicial dissolution of the Cooperative, and whether the Cooperative acted unreasonably and unlawfully in failing to distribute its reserves. See id. ¶¶ 78–85. Specifically, plaintiffs allege that, "[w]ith the elimination of the Federal Tobacco Program, the principal function of [the Cooperative] ceased to exist, and for substantially all of its Members, including the Plaintiffs, the original expectations of Members for their participation in this farming cooperative ceased." Id. ¶ 30. Plaintiffs also allege that the Cooperative is unlawfully retaining net gains realized from the sale of the 1967–1973 crops, from the sale of loan tobacco released by the CCC, and from the sale of tobacco that was ceded to the Cooperative under FETRA. See id. ¶¶ 35–41. As for the distribution claim, plaintiffs allege that the Cooperative unreasonably and unlawfully retained net gains as reserves, including net gains realized from the sale of the 1967-1973 crops, from the sale of loan tobacco released by the CCC, and from the sale of tobacco that was ceded to the Cooperative under FETRA. See id. ¶¶ 86–96. As for the dissolution claim, plaintiffs allege that the Cooperative should be dissolved because FETRA eliminated the Cooperative's purpose, the Cooperative's assets are being misapplied and wasted, and the Board is acting oppressively. See id. ¶¶ 97–102. On December 5, 2012, plaintiffs and the Cooperative jointly

15

moved for a temporary stay pending decision of the class certification motion in the Fisher/Lewis action [D.E. 18]. On December 17, 2012, this court granted the temporary stay [D.E. 22].

On June 27, 2013, the Wake County Superior Court granted the motion for class certification in the Fisher/Lewis action. On February 24, 2014, the Wake County Superior Court issued an amended order granting the motion for class certification because the initial order omitted findings of fact and conclusions of law necessary for appellate review. On March 10, 2014, the Cooperative filed an interlocutory appeal concerning the class certification decision. On October 10, 2014, the Supreme Court of North Carolina, on its own initiative, certified the grant of class certification for interlocutory review "prior to determination in the Court of Appeals." Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp., 766 S.E.2d 609, 610 (N.C. 2014) (unpublished).

During the pendency of the state court's review of the motion for certification, the Speaks plaintiffs and the Cooperative jointly moved to extend the temporary stay [D.E. 23, 27, 29, 33, 35, 37, 39]. This court granted each of these motions [D.E. 26, 28, 31, 34, 36, 38, 40]. Throughout the temporary stay, the parties provided this court with numerous status reports [D.E. 41, 42, 43, 44, 46, 47].

On December 21, 2016, the Supreme Court of North Carolina affirmed the class certification in the Fisher/Lewis action. See Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp., 369 N.C. 202, 794 S.E.2d 699 (2016). In doing so, the Supreme Court of North Carolina did not address the merits of any of the underlying claims. See id. at 210–11, 794 S.E.2d at 707.

In early 2017, the parties in the Speaks action began discussing how to proceed with this putative class action in federal court. On May 11 and 12, 2017, pursuant to this court's local rules, the parties in the Speaks action participated in a two-day mediation with the Honorable Frank W. Bullock, Jr., a distinguished, retired United States District Judge and certified mediator. After

16

extensive hard-fought negotiations, the parties in the <u>Speaks</u> action entered into a proposed settlement agreement. <u>See</u> [D.E. 60-1]. On September 8, 2017, the <u>Speaks</u> plaintiffs moved for certification of a settlement class and preliminary approval of the proposed settlement [D.E. 60]. On September 13, 2017, the <u>Speaks</u> plaintiffs filed an amended complaint [D.E. 64]. On September 13, 2017, this court entered an order preliminarily approving the settlement and scheduled the final fairness hearing for January 19, 2018 [D.E. 63]. On January 5, 2018, plaintiffs moved for final approval of the settlement [D.E. 216]. On January 19, 2018, the court held a final fairness hearing. <u>See</u> [D.E. 259].

II.

Objectors contend that this court lacks subject-matter jurisdiction under both federal-question jurisdiction and the Class Action Fairness Act ("CAFA"). Alternatively, objectors contend that this court should abstain. Objectors also contend that this court lacks subject-matter jurisdiction because individuals who opt out of an existing certified class may not pursue a separate class action covering the same or similar issues. The court addresses these arguments seriatim.

A.

The court has federal-question jurisdiction under 28 U.S.C. § 1331 over plaintiffs' declaratory judgment claim, and supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367(a). <u>See, e.g.,</u> <u>Artis v. Dist. of Columbia</u>, 138 S. Ct. 594, 597–98 (2018).[5] In assessing federal-question jurisdiction over a declaratory judgment claim, courts must "conceptually realign the declaratory judgment parties and claims and analyze them as they would appear in a

_____

[5] Plaintiffs' failure to cite 28 U.S.C. § 1331 in its complaint or amended complaint does not control whether this court has federal-question jurisdiction over one of plaintiffs' claims. <u>See, e.g.,</u> <u>Johnson v. City of Shelby</u>, 135 S. Ct. 346, 347 (2014) (per curiam).

coercive suit." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 67–68 (2d Cir. 2012); see Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 670–72 (1950). When the parties and claims are realigned, some of plaintiffs' declaratory judgment claims arise under federal law. Specifically, the Speaks plaintiffs ask the court to determine whether the Cooperative's primary function ceased to exist when Congress enacted FETRA, whether the Cooperative violated plaintiffs' statutory and common law rights by failing to distribute its net profits, and whether the plaintiffs are entitled to distribution of the Cooperative's reserves, a portion of which were accumulated when the Cooperative sold tobacco ceded to it under FETRA. See Am. Compl. ¶¶ 14–15, 27–31, 38–41, 78–102. The Speaks plaintiffs claim that FETRA entitles them to seek judicial dissolution and distribution of the Cooperative's reserves. These claims "arise" under federal law because plaintiffs are "alleging an affirmative claim arising under federal law against the declaratory judgment defendant." Morgan Cty. War Mem'l Hosp. v. Baker, 314 F. App'x 529, 532–33 (4th Cir. 2008) (per curiam) (unpublished); see Bd. of Tr. of the Plumbers & Pipefitters Nat'l Pension Fund v. Fralick, 601 F. App'x 289, 293 (5th Cir. 2015) (per curiam) (unpublished); Iberiabank v. Beneva 41-I, LLC, 701 F.3d 916, 919 n.4 (11th Cir. 2012); Columbia Gas Transmission Corp. v. Drain, 237 F.3d 366, 370–71 (4th Cir. 2001). The court could not rule on these claims without interpreting FETRA and its regulations.[6]

A federal court also may have federal jurisdiction over state law claims in a "small class of cases in which a well-pleaded complaint establishes that the plaintiff's right to relief necessarily

_____

[6] FETRA does not appear to create a private federal cause of action. See Lay v. Burley Stabilization Corp., 312 F. App'x 752, 757 (6th Cir. 2009) (unpublished) (Moore, J., concurring). However, a plaintiff's failure to plead a federal claim in a manner that would withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is not a question for the jurisdictional analysis. See, e.g., Arbaugh v. Y&H Corp., 546 U.S. 500, 504–05, 513–16 (2006).

depends on resolution of a substantial question of federal law, in that federal law is a necessary element of one of the well-pleaded claims." Pinney v. Nokia, Inc., 402 F.3d 430, 442 (4th Cir. 2005) (quotation and alterations omitted); see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312–14 (2005); Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 8–9 (1983); Lay, 312 F. App'x at 755. A state-law claim raises a substantial question of federal law when the federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Virginia ex rel. Hunter Labs., LLC v. Virginia, 828 F.3d 281, 287 (4th Cir. 2016) (quotation omitted); see Gunn v. Minton, 568 U.S. 251, 258 (2013).

The Speaks plaintiffs seek judicial dissolution of the Cooperative because "[w]ith the enactment of FETRA, the Federal Tobacco Program was eliminated, thereby eliminating the principal and historical purpose and function of [the Cooperative]." Am. Compl. ¶ 98; see also id. ¶¶ 1, 27–31, 38–41, 78–102. Plaintiffs also allege that "[u]pon information and belief, [the Cooperative] intends to retain the amounts realized from the sale of the Ceded Tobacco [released under FETRA], instead of distributing or allocating those funds to the Plaintiffs and other Class Members." Id. ¶ 40; see also id. ¶¶ 27–29.

Applying Grable, the court concludes that the four Grable factors are met. As for the first Grable factor, a plaintiff's right to relief "necessarily depends on a question of federal law only when every legal theory supporting the claim requires the resolution of a federal issue." Flying Pigs, LLC v. RRAJ Franchising LLC, 757 F.3d 177, 182 (4th Cir. 2014) (emphasis omitted); see Pressl v. Appalachian Power Co., 842 F.3d 299, 304 (4th Cir. 2016). A "federal issue" is necessarily raised because the court could not determine whether plaintiffs are entitled to a distribution of the Cooperative's reserves, a portion of which were accumulated when the Cooperative sold tobacco

19

ceded to it under FETRA, or whether FETRA eliminated the Cooperative's purpose, without interpreting FETRA and its regulations. As for the second Grable factor, the issue is "actually disputed" because the parties dispute whether plaintiffs are entitled to a distribution of the Cooperative's reserves, a portion of which were accumulated when the Cooperative sold tobacco ceded to it under FETRA, and whether FETRA eliminated the Cooperative's purpose.

As for substantiality, the "crucial factor . . . [is] the presence of a nearly pure issue of law." Adventure Outdoors, Inc. v. Bloomerg, 552 F.3d 1290, 1299 (11th Cir. 2008) (quotation omitted); see Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 700 (2006); Bennett v. Sw. Airlines Co., 484 F.3d 907, 910 (7th Cir. 2007). Substantiality looks beyond the importance of the issue to the parties and considers "the importance of the issue to the federal system as a whole." Gunn, 568 U.S. at 260; see NASDAQ OMX Grp., Inc., v. UBS Secs., LLC, 770 F.3d 1010, 1024 (2d Cir. 2014); Rose Acre Farms, Inc. v. N.C. Dep't of Env't & Nat. Res., 131 F. Supp. 3d 496, 503–04 (E.D.N.C. 2015). The federal issue here is substantial. As in Grable, this case presents a "nearly pure issue of law"—whether FETRA provides the Speaks plaintiffs with a basis to seek dissolution and forced distribution of the Cooperative's reserves. See, e.g., Grable & Sons, 545 U.S. at 315–16; Rose Acre Farms, 131 F. Supp. 3d at 503. Resolving this question requires interpreting FETRA and its regulations, not inquiring into factual issues specific to the Cooperative. Moreover, Congress has a strong interest in ensuring the terms of FETRA, which marked the end of the Tobacco Price Support Program, are resolved consistently with FETRA and its regulations. See Lay, 312 F. App'x at 755.

As for the fourth Grable factor, Congress regulated the tobacco market for decades, and has a strong interest in ensuring FETRA is followed. See, e.g., Burrell v. Bayer Corp., No. 1:17-cv-00032-MOC-DSC, 2017 WL 1032504, at *4 (W.D.N.C. Mar. 17, 2017) (unpublished).

Accordingly, federal jurisdiction would not upset the federal-state balance. Thus, this court has federal-question jurisdiction over at least one of plaintiffs' claims, and supplemental jurisdiction over the remaining state law claims. See Artis, 138 S. Ct. at 597–98; 28 U.S.C. § 1367(a).

B.

Alternatively, the court has diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d). Congress "enacted CAFA to curb perceived abuses of the class action device which, in the view of CAFA's proponents, had often been used to litigate multi-state or even national class actions in state courts." Jackson v. Home Depot U.S.A., Inc., 880 F.3d 165, 168 (4th Cir. 2018) (quotation omitted). CAFA provides the district court with original jurisdiction over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action," and in which, "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A); see Quicken Loans Inc. v. Alig, 737 F.3d 960, 964 (4th Cir. 2013). Section 1332(d)(2)(A) of CAFA requires three things: (1) minimal diversity; (2) an amount in controversy greater than $5,000,000; and (3) a class action. See Mississippi v. AU Optronics Corp., 134 S. Ct. 736, 740 (2014); Lanier v. Norfolk S. Corp., 256 F. App'x 629, 631–32 (4th Cir. 2007) (per curiam) (unpublished). Here, the requirements are met. The Cooperative is a citizen of North Carolina. See Am. Compl. ¶ 5. The settlement class includes thousands of class members who are citizens of Virginia, North Carolina, South Carolina, Georgia, and Florida. See id. The amount in controversy exceeds $5,000,000, exclusive of interests and costs. See id.

In opposition, objectors contend that CAFA's internal affairs exception applies. See 28 U.S.C. § 1332(d)(9)(B); [D.E. 192] 1–3. The internal affairs exception proscribes CAFA's applicability when the action "solely involves a claim" that "relates to the internal affairs or

21

governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized." 28 U.S.C. § 1332(d)(9)(B) (emphasis added); see Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 27 n.2 (2d Cir. 2010); Becher v. Nw. Mut. Life Ins. Co., No. CV 10–6264 PSG (AGRx), 2010 WL 5138910, at *2 (C.D. Cal. Dec. 9, 2010) (unpublished). Although Congress did not define "internal affairs" in CAFA, the Supreme Court defined internal affairs in Edgar v. MITE Corp., 457 U.S. 624, 645 (1982). See LaPlant v. Nw. Mut. Life Ins. Co., 701 F.3d 1137, 1139–40 (7th Cir. 2012); Becher, 2010 WL 5138910, at *2. In Edgar, the Supreme Court defined internal affairs as "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." Edgar, 457 U.S. at 645.

CAFA's internal affairs exception does not apply. First, the claims in this case extend beyond the Cooperative and its "current officers, directors, and [members]." Class members include all individuals and entities, including heirs and assigns, who are, or were at any time, members of the Cooperative during the class period that dates back to June 1, 1946. See [D.E. 60-1] 7. The class definition alone demonstrates that the claims extend beyond matters or relationships between the Cooperative and its current officers, directors, and members. See Edgar, 457 U.S. at 645. Moreover, the internal affairs exception applies only when the class action involves claims that relate solely to the organization's internal affairs or governance and that arise under the laws of the state by which the organization is governed. See 28 U.S.C. § 1332(d)(9)(B); LaPlant, 701 F.3d at 1140–41; Rosenberg v. Lexington Ins. Co., No. 4:08-0529-TLW-TER, 2008 WL 11348720, at *2 (D.S.C. Sept. 30, 2008) (unpublished). The claims in this case do not meet this definition. To the contrary, the claims in this case would require resolving important questions of federal law, including whether

the Speaks plaintiffs have a claim to proceeds from the tobacco that was ceded to the Cooperative under FETRA, and whether the Cooperative's purpose ceased to exist due to FETRA. Such questions require the court to analyze FETRA. See, e.g., Lay, 312 F. App'x at 755. Plaintiffs' claims also implicate questions of North Carolina contract law. See Am. Compl. ¶ 72(c) (common questions include whether the Cooperative "by and through its corporate officers and agents, have intentionally and/or negligently breached the Plaintiffs' contractual rights and interest"). Accordingly, CAFA's internal affairs exception does not apply. See, e.g., LaPlant, 701 F.3d at 1140–41.[7] Thus, federal jurisdiction is proper here.

C.

Objectors contend that the court should abstain under Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), or Burford v. Sun Oil Company, 319 U.S. 315 (1943). As for abstention under Colorado River, the "rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." McClellan v. Carland, 217 U.S. 268, 282 (1910). Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Colorado River, 424 U.S. at 817. Colorado River abstention provides a narrow exception to this general rule. See vonRosenberg v. Lawrence, 849 F.3d 163, 167 (4th Cir. 2017); Great Am. Ins. Co. v. Gross, 468 F.3d 199, 205–06 (4th Cir. 2006); Chase Brexton Health Servs., Inc. v. Maryland, 411 F.3d 457, 462–63 (4th Cir. 2005). Under this doctrine, a federal court may decline to exercise jurisdiction in exceptional circumstances that are "relate[d] to a policy of avoiding unnecessary constitutional decisions and of

---

[7] CAFA's permissive home state exception also does not apply. See 28 U.S.C. § 1332(d)(3); Laws v. Priority Tr. Servs. of N.C., L.L.C., No. 3:08-CV-103, 2008 WL 3539512, at *6 (W.D.N.C. Aug. 11, 2008) (unpublished). Even if it did, the exception is discretionary, and this court would not apply it.

accommodating federal-state relations." Chase Brexton, 411 F.3d at 462; see vonRosenberg, 849 F.3d at 167. The Supreme Court and the United States Court of Appeals for the Fourth Circuit have cautioned that Colorado River abstention should be applied parsimoniously and that "abdication of the obligation to decide cases can be justified under abstention only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." Chase Brexton, 411 F.3d at 463 (alterations and quotations omitted); see Colorado River, 424 U.S. at 813.

The threshold inquiry in determining whether Colorado River abstention applies is whether there are parallel federal and state actions. See vonRosenberg, 849 F.3d at 168; Chase Brexton, 411 F.3d at 463. If the court determines that there are parallel actions, it must consider whether exceptional circumstances warrant declining jurisdiction. See Colorado River, 424 U.S. at 813; vonRosenberg, 849 F.3d at 167–68. Several factors are relevant to this inquiry: "(1) jurisdiction over the property; (2) inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal law is implicated; and (6) whether the state court proceedings are adequate to protect the parties' rights." Gannett Co. v. Clark Constr. Grp., Inc., 286 F.3d 737, 741 (4th Cir. 2002); see Great Am. Ins., 468 F.3d at 207–08.

Actions are parallel under Colorado River if "substantially the same parties litigate substantially the same issues in different forums." Chase Brexton, 411 F.3d at 464; see vonRosenberg, 849 F.3d at 168; Great Am. Ins., 468 F.3d at 208. Under Colorado River, "even state and federal claims arising out of the same factual circumstances do not qualify as parallel if they differ in scope or involve different remedies." vonRosenberg, 849 F.3d at 168.

Although the competing class actions involve the same defendant (i.e., the Cooperative), the actions involve different plaintiffs. Most named plaintiffs in the Speaks action have opted-out of

24

the Fisher/Lewis action. See [D.E. 192] 3; [D.E. 192-1] 32–34 (list of opt-outs).[8] The court

recognizes that the "substantially similar" inquiry does not require identical parties. See Chase

Brexton, 411 F.3d at 464. Abstaining, however, would deprive the Speaks plaintiffs, and any other

class members who opted out of the Fisher/Lewis action, the opportunity to pursue their claims. See

id. Moreover, under Colorado River, the claims in the competing class action are not "substantially

similar." See Kelly v. Maxum Specialty Ins. Grp., 868 F.3d 274, 285 (3d Cir. 2017) ("Cases are not

parallel under Colorado River abstention where the federal court case involves claims that are

distinct from those at issue in a state court case . . . .") (quotation omitted); vonRosenberg, 849 F.3d

at 168–69; Chase Brexton, 411 F.3d at 461–65; Gannett Co., 286 F.3d at 741–43; Al-Abood v. El-

Shamari, 217 F.3d 225, 232–33 (4th Cir. 2000); McLaughlin v. United Va. Bank, 955 F.2d 930, 935

(4th Cir. 1992). Plaintiffs in the Speaks action seek declaratory judgment on numerous issues

(including federal issues), distribution of reserves, and judicial dissolution. See Am. Compl. ¶¶

78–102. Plaintiffs in the Fisher/Lewis action, however, do not seek judicial dissolution.

See Fisher/Lewis Am. Compl. [D.E. 228-29]. Under Colorado River, the judicial dissolution claim

in the Speaks action is separate and distinct from the issues raised in the Fisher/Lewis action. Even

if all the claims in the Fisher/Lewis action were resolved, the judicial dissolution claim in the Speaks

action would remain unresolved. Accordingly, under Colorado River, the proceedings are not

parallel. See, e.g., vonRosenberg, 849 F.3d at 168–69; Great Am. Ins., 468 F.3d at 207–09; Chase

Brexton, 411 F.3d at 461–65; Gannett Co., 286 F.3d at 741–43; Al-Abood, 217 F.3d at 232–33;

McLaughlin, 955 F.2d at 935.

Alternatively, even if the actions are parallel under Colorado River, exceptional

_____

[8] Objectors state that Robin Rogers is the only named plaintiff in the Speaks action who did
not opt-out of the Fisher/Lewis action. See [D.E. 192] 3.

circumstances do not warrant abstention. As for the first two factors, the proceedings do not involve property where the first court assumed in rem jurisdiction to the exclusion of other courts, and no evidence suggests that the federal forum is inconvenient. See vonRosenberg, 849 F.3d at 168–69; Great Am. Ins., 468 F.3d at 209; Chase Brexton, 411 F.3d at 465. As for the desirability of avoiding piecemeal litigation, this factor weighs against abstention. As noted, the Speaks and the Fisher/Lewis action involve different plaintiffs and the Speaks action involves a distinct claim for judicial dissolution. Even if the state court proceeding is resolved, the factual and legal issues concerning the judicial dissolution claim in the Speaks action would remain unsolved. See, e.g., vonRosenberg, 849 F.3d at 169; Great Am. Ins., 468 F.3d at 208–09; Chase Brexton, 411 F.3d at 465–66; Gannett Co., 286 F.3d at 744–45. Accordingly, abstention would not avoid piecemeal litigation.

As for the order of the proceedings, this factor is not "measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 21 (1983). The Fisher/Lewis action was filed first, the class was certified in 2013, and discovery has been proceeding for approximately one year. See Fairness Hr'g Tr. [D.E. 260] at 59.[9] Nonetheless, Dr. Harrison, plaintiffs' expert in Fisher/Lewis, testified that plaintiffs' counsel in Fisher/Lewis has not asked him to analyze what portion of the Cooperative's reserves are unreasonable, an issue that is at the very core of the Fisher/Lewis case. See Harrison Dep. at 94–95 [D.E. 241-1]. At the fairness hearing, plaintiffs' counsel in Fisher/Lewis (who is also counsel for objector Pender Farms), confirmed that he had not yet asked Dr. Harrison, or any other expert, to opine on what "reasonable"

---

[9] The parties in Fisher/Lewis also engaged in discovery concerning the settlement in 2006–2008. See [D.E. 228] 30.

reserves would be for the Cooperative and to explain the rationale for any such expert opinion. See Fairness Hr'g Tr. at 59–60. When this court then asked plaintiffs' counsel in Fisher/Lewis how he could know that Dr. Harrison would not ultimately opine that the Cooperative's reserves are reasonable, he contended that he could not know for sure, but felt that Dr. Harrison ultimately would opine that some portion of the Cooperative's reserves was unreasonable. See id. at 60. For a case that has been pending in state court since 2005, these answers concerning an issue at the core of the Fisher/Lewis action are astonishing. Cf. Charles Dickens, Bleak House (1853). At best, this factor tilts slightly in favor of abstention. See Great Am. Ins., 468 F.3d at 209.

As for the fifth factor, important federal issues concerning FETRA are implicated in the Speaks action. Accordingly, this factor weighs against abstention. See vonRosenberg, 849 F.3d at 169; Chase Brexton, 411 F.3d at 466.

As for the final factor, this factor is relevant when one forum is inadequate to protect the parties' rights. See, e.g., African Methodist Episcopal Church v. Lucien, 756 F.3d 788, 801 (5th Cir. 2014) ("[T]he sixth factor . . . can only be neutral or weigh against abstention); Chase Brexton, 411 F.3d at 466; Ambrosia Coal & Constr. Co. v. Morales, 368 F.3d 1320, 1334 (11th Cir. 2004); Ryan v. Johnson, 115 F.3d 193, 200 (3d Cir. 1997); Extra Storage Space, LLC v. Maisel-Hollins Dev., Co., 527 F. Supp. 2d 462, 468 (D. Md. 2007). Here, no evidence suggests that either forum is inadequate to protect the parties' rights. Accordingly, this factor is neutral.

Even if the competing class actions are parallel under Colorado River, only one of the six factors supports Colorado River abstention. After balancing the factors, "[o]nly the clearest of justifications will warrant dismissal." Colorado River, 424 U.S. at 819; see vonRosenberg, 849 F.3d at 167; Great Am. Ins., 468 F.3d at 207–12; Chase Brexton, 411 F.3d at 466; Gannett Co., 286 F.3d at 744–48. Nothing justifies abstention under Colorado River. Thus, the court declines to abstain

under Colorado River.

As for Burford abstention, "[t]he Burford doctrine justifies the dismissal of a federal action in a narrow range of circumstances." Martin v. Stewart, 499 F.3d 360, 364 (4th Cir. 2007) (alteration and quotation omitted); see Quakenbush v. Allstate Ins. Co., 517 U.S. 706, 726 (1996); Town of Nags Head v. Toloczko, 728 F.3d 391, 395–96 (4th Cir. 2013). Under Burford, a federal court may abstain when

> federal adjudication would unduly intrude upon complex state administrative processes because either: (1) there are difficult questions of state law whose importance transcends the result in the case then at bar; or (2) federal review would disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern.

Martin, 499 F.3d at 364 (quotation and alteration omitted); see New Orleans Pub. Serv. Inc. v. Council of New Orleans, 491 U.S. 350, 362–63 (1989); Town of Nags Head, 728 F.3d at 396. Abstention is the "exception, not the rule" and only applies in extraordinary circumstances. Washington Gas Light Co. v. Prince George's Cty. Council, 711 F.3d 412, 418 (4th Cir. 2013); see Martin, 499 F.3d at 363–64.

Objectors argue that the plaintiffs' dissolution claim makes Burford abstention appropriate. See [D.E. 255] 10–11. The court rejects this argument. The dissolution claim does not present a difficult question of state law. To the contrary, the dissolution statute at issue, N.C. Gen. Stat. § 55A-14-30, is unambiguous.[10] Thus, resolving this claim would not require the court to "answer

_____

[10] N.C. Gen. Stat. § 55A-14-30 states:

> The superior court may dissolve a corporation . . . [i]n a proceeding by a member or director, if it is established that: (a) The directors are deadlocked in the management of the corporate affairs, and the members, if any, are unable to break the deadlock; (b) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent; (c) The members are deadlocked in voting power

disputed questions of state law." Martin, 499 F.3d at 370 (quotation omitted). Moreover, even if North Carolina has a strong interest in adjudicating a dissolution claim, a strong state interest alone does not justify Burford abstention. See Martin, 499 F.3d at 369; TransDulles Ctr., Inc. v. USX Corp., 976 F.2d 219, 224 (4th Cir. 1992); Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d 170, 173 (4th Cir. 1983). Similarly, because the dissolution statute is unambiguous and because there is no complex regulatory scheme, federal review would not disrupt any state efforts to establish a coherent policy. See Town of Nags Head, 728 F.3d at 397. Finally, the federal-law issues in this case are "a major consideration weighing against [abstention]." Moses H. Cone, 460 U.S. at 26. Thus, the court declines to abstain under Burford.

D.

Objectors also argue that the court lacks subject-matter jurisdiction over this action because individuals who opt-out of an existing certified class may not pursue a separate class action covering the same or similar issues. See [D.E. 192] 3. The court rejects this argument. See Arbaugh, 546 U.S. at 503–06, 513–15 (discussing subject-matter jurisdiction in federal court). Here, the Speaks plaintiffs filed this putative class action in federal court before opting out or even having the opportunity to opt out of the Fisher/Lewis action. Indeed, the Speaks plaintiffs filed this putative class action in federal court before the competing class action in state court was certified as a class action. Furthermore, competing state and federal class actions are common, and nothing suggests

_____

and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have, or would otherwise have, expired; (d) The corporate assets are being misapplied or wasted; or (e) The corporation is no longer able to carry out its purposes.

The court did not locate any controlling decision interpreting this statute. See Russell Robinson, North Carolina Corporation Law § 33.08 (Matthew Bender, 7th ed. 2002).

that the competing Fisher/Lewis class action in state court defeats the subject-matter jurisdiction of this court. See, e.g., id.; Matsushita Elec. Indus., 516 U.S. at 373–87; Kline v. Burke Constr. Co., 260 U.S. 226, 230 (1922); Adkins v. Nestle Purina PetCare Co., 779 F.3d 481, 484 (7th Cir. 2015); Blair v. Equifax Check Servs., Inc., 181 F.3d 832, 838 (7th Cir. 1999); In re HSBC Bank, USA, N.A. Debit Card Overdraft Fee Litig., 99 F. Supp. 3d 288, 314 (E.D.N.Y. 2015) ("Further, as a general matter, as demonstrated by the extensive case law addressing motions to enjoin competing class actions, efforts by one or multiple parties to circumvent another similar case are commonplace.").

III.

A.

The court must determine whether to certify this class for settlement. The proposed settlement defines the settlement class as:

> all individuals, proprietorships, partnerships, corporations, and other entities that are or were shareholders and/or members of U.S. Tobacco at any time during the Class Period, without any exclusion, including any heirs, representatives, executors, powers-of-attorney, successors, assigns, or others purporting to act for or on their behalf with respect to U.S. Tobacco and/or the Settled Claims. There shall be no exclusions from the Settlement Class, except for any putative Settlement Class Members who exclude themselves by timely filing an "opt out" request in accordance with the requirements set forth in the Class Notice[.]

Proposed Settlement Agreement [D.E. 60-1] 7. The settlement establishes a claims program whereby the settlement class will receive cash payments. The Cooperative (i.e., U.S. Tobacco) will pay into the settlement fund $24 million (less any attorneys' fees, costs, and incentive awards which are capped at no more than $2 million) over a five-year period to be held in escrow on behalf of the settlement class. See id. at 9–10, 14. Payments into the settlement fund will be allocated as follows: (1) 75% of the payments will initially fund "Group 1" claimants on a pro rata basis based on the number of pounds claimants marketed to the Cooperative during the class period relative to the total

30

number of pounds from all class members who submit a "Group 1" claim (subject to a $15,000 cap), and (2) 25% of the payments, plus any left-over funds from "Group 1," will be allocated to "Group 2" on a pro rata basis based on the number of years the claimant marketed and sold tobacco relative to the total number of years of all class members who submit a "Group 2" claim. See id. at 12–14. Claimants are eligible to receive payments from both "Group 1" and "Group 2" funds. See id. at 14. The Group 1 allocation scheme ensures that member-growers who marketed and sold a greater volume of tobacco receive a higher payment, and the $15,000 cap ensures that the settlement fund will not be exhausted by a limited number of member-growers. See id. at 12, 14.

A claims administrator will be responsible for administering the settlement, providing claim forms, maintaining the settlement website, and monitoring a toll-free telephone number that class members can call to obtain more information about the settlement. See id. at 13. Class members have until May 26, 2018, to submit a claim form under Group 1, Group 2, or both. See id.

Class members are asked to provide documentation they possess concerning the poundage they sold and years they patronized the Cooperative. See id. at 14. However, "even if the claimant provides no data at all regarding the amount of flue-cured tobacco marketed and sold or the years in which the grower marketed and sold flue-cured tobacco and/or no documentation, [the claims administrator] will attempt to validate the claim using the Cooperative's records." [D.E. 217-6] 255; see Proposed Settlement Agreement at 15. Thus, class members can recover from the settlement without submitting any documentation. See id.; Jason Stinehart 2d Decl. [D.E. 217-6] ¶ 41.[11]

The settlement provides for a release of all claims by class members against the Cooperative

---

[11] Some objectors argue that the settlement is not fair because they do not have the records required to submit a claim and that the Cooperative has the records. See, e.g., [D.E. 141]. Records are not required to submit a claim under Group 1, Group 2, or both. If class members do not have records, the claims administrator will rely on the Cooperative's records to process the claims.

for all matters related to the claims in this action. See Proposed Settlement Agreement at 24.[12] The settlement will not go into effect until there is:

> Dismissal, with prejudice, or issuance of an appropriate order precluding further pursuit of any class-wide claims on behalf of these class members, including but not limited to those associated with the actions <u>Dan Lewis et al. v. Flue-Cured Tobacco Stabilization Corp.</u>, 05 CVS 188 (N.C. Super. Ct.); <u>Kay W. Fisher et al. v. Flue-Cured Tobacco Stabilization Corp.</u>, 05 CVS 1938 (N.C. Super. Ct.), as currently pending in the N.C. Superior Court. [This condition does not] prevent any individual plaintiffs from opting out of [this settlement] . . . and pursuing their claims on an individual basis.

<u>Id.</u> at 8.

Some objectors argue that the scope of the release is too broad. See, e.g., [D.E. 162, 192].

---

[12] Specifically, the release provides:

> Regardless of whether Settlement Class Members make claims under this Settlement, the Court's Order and Final Judgment will dismiss Plaintiffs' and Settlement Class Members' claims with prejudice and will forever release, remise, acquit, satisfy, and discharge Defendant from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, covenants, controversies, damages, judgments, extents, executions, liabilities, claims, and demands whatsoever, in law, admiralty or equity, whether based on acts, omissions, or agreements, whether arising under federal, state, local, statutory, and/or common law and/or any other law, rule, or regulation (including, without limitation, the federal securities laws), whether known claims or Unknown Claims, that have been or could have been asserted, either directly, derivatively, or otherwise, in any forum by the Plaintiffs or the Settlement Class Members, and/or any of them, against any of the Released Parties which arise out of, are based upon, are in connection with, and/or relate in any way to: (i) any of the matters, things, causes, or events that are specifically released pursuant to any of the provisions of this Stipulation or any document executed in connection herewith; (ii) any matter, thing, cause, or event whatsoever, or any series thereof, involved, set forth, and/or related to the Complaint in this Action; and (iii) any action or inaction of U.S. Tobacco or its Board of Directors, or any of them, whatsoever during the Class Period; provided, however, that the Settled Claims shall not include the right of any of the Parties or the Released Parties to enforce the terms of the Settlement.

Proposed Settlement Agreement at 24.

Broad release clauses are common because "defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 106 (2d Cir. 2005) (quotation and alteration omitted); see Olden v. Gardner, 294 F. App'x 210, 219–20 (6th Cir. 2008) (unpublished). Parties may release "not only the very claims raised in their cases, but also claims arising out of the 'identical factual predicate.'" Berry v. Schulman, 807 F.3d 600, 616 (4th Cir. 2015); see In re MI Windows & Doors, Inc., Prods. Liab. Litig., 860 F.3d 218, 225 (4th Cir. 2017). This principle holds true even if the claim was not presented, or could not have been presented in the settled class action. See Matsushita Elec. Indus., 516 U.S. at 376–77; In re Corrugated Container Antitrust Litig., 643 F.2d 195, 221–22 (5th Cir. 1981) (collecting cases). The release provision in the proposed settlement agreement properly seeks to release claims that arise from the same "factual predicate" as the claims in the Speaks action. See Proposed Settlement Agreement at 24. Accordingly, the court rejects the argument that the scope of the release is too broad. See, e.g., In re MI Windows, 860 F.3d at 225; Berry, 807 F.3d at 616; Olden, 294 F. App'x at 219–20.

B.

The requirements for certification of a settlement class parallel the requirements for certification of a litigation class. See Berry, 807 F.3d at 608; Decohen v. Abbasi, LLC, 299 F.R.D. 469, 476 (D. Md. 2014). In order to be certified, the putative class must meet the four Rule 23(a) prerequisites and fit within one of the three Rule 23(b) categories. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620–21 (1997); Berry, 807 F.3d at 608. The parties seek certification under Rule 23(b)(3).

"[D]istrict courts have wide discretion in deciding whether or not to certify a class and their

decisions may be reversed only for abuse of discretion." Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 424 (4th Cir. 2003) (citations omitted); see Berry, 807 F.3d at 608; Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 179 (4th Cir. 2010); Cent. Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 185 (4th Cir. 1993). On September 13, 2017, the court preliminarily approved the settlement class [D.E. 63]. At this stage, however, the court will again consider whether the settlement class meets the Rule 23(a) prerequisites and the requirements of Rule 23(b)(3). See, e.g., Amchem, 521 U.S. at 613–22; Berry, 807 F.3d at 608; Gunnells, 348 F.3d at 423–24.

1.

Under Federal Rule of Civil Procedure 23(a), class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

As for numerosity, "[t]here is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied." Kelley v. Norfolk & W. Ry., 584 F.2d 34, 35 (4th Cir. 1978) (per curiam). "The issue is one primarily for the District Court, to be resolved in light of the facts and circumstances of the particular case." Id.; see Holsey v. Armour & Co., 743 F.2d 199, 217 (4th Cir. 1984). Here, the proposed settlement class consists of approximately 800,000 former and current members of the Cooperative. Accordingly, the settlement class meets Rule 23(a)'s numerosity requirement. See, e.g., Gunnells, 348 F.3d at 425–27; Velasquez-Monterrosa v. Mi Casita Rests., No. 5:14-CV-448-BO, 2016 WL 1703351, at *4–5 (E.D.N.C. Apr. 26, 2016) (unpublished).

As for the second and third Rule 23(a) factors, "the requirements for typicality and

34

commonality often merge." Romero v. Mountaire Farms, Inc., 796 F. Supp. 2d 700, 714 (E.D.N.C. 2011); see Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982); Kidwell v. Transp. Commc'ns Int'l Union, 946 F.2d 283, 305 (4th Cir. 1991). Under the "commonality" requirement of Rule 23(a)(2), at least one common question of law or fact must exist among class members. See EQT Prod. Co. v. Adair, 764 F.3d 347, 360 (4th Cir. 2014); Brown v. Nucor Corp., 576 F.3d 149, 153 (4th Cir. 2009); Haywood v. Barnes, 109 F.R.D. 568, 577 (E.D.N.C. 1986). The typicality requirement is met if, "the claims of the representative parties [are] typical of the claims of the class." Haywood, 109 F.R.D. at 578; see Soutter v. Equifax Info. Servs., LLC, 498 F. App'x 260, 264–65 (4th Cir. 2012) (unpublished); Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006). A claim is typical if it "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." Beattie v. CenturyTel, Inc., 511 F.3d 554, 561 (6th Cir. 2007); see Romero, 796 F. Supp. 2d at 714. The typicality requirement is "captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." Deiter, 436 F.3d at 466 (quotation omitted); see Soutter, 498 F. App'x at 264–65; Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998). Here, the class representatives and the other putative class members share common questions of law and fact, including whether the Speaks plaintiffs are entitled to a distribution from the Cooperative's reserves or dissolution of the Cooperative, and whether the Cooperative improperly retained funds after Congress enacted FETRA. See Am. Compl. ¶¶ 15, 27–31, 38–41, 78–102. As for the typicality requirement, the claims arise from the same events—the Cooperative cleaning its membership rolls and retaining reserves and Congress implementing FETRA. Moreover, the claims are based on the same legal theories. Accordingly, these requirements are satisfied. See, e.g., Beattie, 511 F.3d at 561–62.

35

As for the fourth requirement, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Amchem, 521 U.S. at 625–26 (alteration and quotation omitted); see In re Red Hat, Inc. Secs. Litig., 261 F.R.D. 83, 87 (E.D.N.C. 2009). The adequacy inquiry also "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625; see Beattie, 511 F.3d at 562. A conflict must be considered "fundamental" to defeat the adequacy requirement. See Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 184 (3d Cir. 2012); Ward, 595 F.3d at 180; Gunnells, 348 F.3d at 430–31. "A conflict is not fundamental when . . . class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants." Ward, 595 F.3d at 180 (quotation and alteration omitted); see Gunnells, 348 F.3d at 430–31. Moreover, in assessing the representative's adequacy, courts may consider several factors including "honesty, conscientiousness, and other affirmative personal qualities." Shiring v. Tier Techs., 244 F.R.D. 307, 315 (E.D. Va. 2007); see In re Red Hat, 261 F.R.D. at 87.

The court appoints Teresa and Toby Speaks, Stanley Smith, Eddie Brown, Robert Poindexter, Mike Mitchell, Roy L. Cook, Alex Shugart, H. Randle Wood, Robin Rogers, and Daniel Lee Nelson as class representatives. Class representatives share the same interest as all class members. All class members are interested in their legal right to the Cooperative's reserves. Class representatives and class members each signed the same marketing agreement and patronized the Cooperative within the relevant time periods. See Am. Compl. ¶¶ 21–23. Class representatives are "all pursuing damages under the same statutes and the same theories of liability, and the differences among them will not . . . pit one group's interests against another." In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 394 (3d Cir. 2015). Moreover, class representatives have "pursue[d] a resolution of the controversy in the interests of the class." Dura-Bilt Corp. v. Chase Manhattan

36

Corp., 89 F.R.D. 87, 101 (S.D.N.Y. 1981); see Berry, 807 F.3d at 613–14.

Objectors contend that the class definition in the Speaks action creates intra-class conflicts, thereby making the class representation inadequate. See [D.E. 192] 5–7, 10–11; [D.E. 255] 11–13. Objectors argue that the class is ill-defined because it "does not account for the differing patronage interests of members." [D.E. 255] 11. Objectors also argue that the class definition in Fisher/Lewis is more appropriate because it accounts for patronage interests. See id. According to objectors, "not accounting for the patronage interests of members in the class definition . . . creates conflicts between class members who delivered tobacco during the years which had profits and those who delivered tobacco during the years which did not see a profit." Id. at 12; see [D.E. 192] 10–11.

The failure to account for patronage interests does not create an intra-class conflict under Rule 23(a)(4).[13] Indeed, in seeking to intervene in this federal action, Daniel Lewis (a named plaintiff in the Fisher/Lewis action) admitted that the "certified class action" in Fisher/Lewis "is on behalf of a class covered by the class definition in this putative federal class action." [D.E. 70-1] 1. The objectors do not identify one person or entity who falls within the class definition in this federal action but outside the class definition in Fisher/Lewis. Moreover, even if the class definition in this federal case includes people or entities who became members of the Cooperative after 2004, that fact does not create a conflict. The central question remains whether any class member is entitled to any part of the Cooperative's reserves. All class representatives and class members "share common

---

[13] The Supreme Court addressed intra-class conflicts in Amchem, 521 U.S. at 625–28. In Amchem, a case that involved a proposed global settlement of current and future asbestos claims, the Supreme Court found that the requirements of Rule 23(a)(4) were not met because there were diverging interests between class members who were presently injured and those class members who could develop injuries in the future. See id. Such considerations are not present here. There are not diverging interests between class members. The class members in the Speaks action and in the Fisher/Lewis action are seeking entitlement to all or some of the Cooperative's reserves.

37

objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants." Ward, 595 F.3d at 180 (quotation and alteration omitted); see Gunnells, 348 F.3d at 431. All claims share the same legal theory and arise from the same facts—class representatives and class members all claim that FETRA eliminated the Cooperative's purpose, that the Cooperative improperly cleaned its membership rolls, that the Cooperative unlawfully retained reserves, and that they are entitled to distribution of reserves and judicial dissolution. Any differences between class members only arise with respect to the amount of damages each member seeks to recover. Such differences do not create adverse or diverging interests. See, e.g., In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 345–46 (3d Cir. 2010); In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 272–73 (3d Cir. 2009). Moreover, objectors have not offered any evidence to show that class representatives will not vigorously assert the interests of the entire class. See, e.g., In re Cmty. Bank, 795 F.3d at 394. Accordingly, any purported conflict is not fundamental. See, e.g., Gunnells, 348 F.3d at 431.

Objectors also argue that there is a conflict of interest concerning the adequacy of representation because the Fisher/Lewis certified class is included in this class. See [D.E. 192] 11–12. Objectors state that, "[t]he Speaks class representatives could not, at the Speaks mediation, adequately represent the interests of the Lewis certified class members because they had opted out of Lewis or, if they had not, because they had not been found adequate to represent those interests and were specifically not permitted to negotiate those interests under the order of the North Carolina superior court because only 'the parties' to Lewis were authorized to mediate the Lewis certified class interests." Id. at 12.

Having found that the Speaks' class representatives adequately represent the interests of all

class members in this federal action, the court rejects these arguments.[14] Objectors cite no case law in support of these positions, and it is unclear how opting out of the Fisher/Lewis class makes these representatives inadequate.

As for the referenced Fisher/Lewis case management order, the local rules of this court mandated that the parties and their counsel in this putative class action in federal court mediate this federal case. See Local ADR Rule 101.a(b). A United States District Court "has discretion to adopt local rules." Hollingsworth v. Perry, 558 U.S. 183, 191 (2010). The local rules of a United States District Court "have the force of law." Id. (quotation omitted). To the extent that the Fisher/Lewis case management order purported to limit the parties or their counsel in this putative class action in federal court from mediating this federal case pursuant to this court's local rules, that portion of the Fisher/Lewis case management order is a nullity. See U.S. Const., art. VI, § 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); Howlett v. Rose, 496 U.S. 356, 371 (1990) ("The Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source."); Donovan v. City of Dallas, 377 U.S. 408, 413–14 (1964) ("[T]he propriety of a state court's punishment of a federal-court litigant for pursuing his right to federal-court remedies is [before us].

---

[14] Objectors' expert, Dr. Harrison, opines that it is unfair that the named plaintiffs in this action are from five counties in North Carolina when only 64.7% of the Cooperative's growers resided in North Carolina. See [D.E. 192-7] 10. Harrison's opinion is not relevant to the adequacy inquiry. Harrison admits that all class members have the same essential legal claim against the Cooperative regardless of their geographic location. See Harrison Dep. at 266–67.

That right was granted by Congress and cannot be taken away by the State. The Texas courts were without power to take away this federal right by contempt proceedings or otherwise."); see also Gen. Atomic Co. v. Felter, 434 U.S. 12, 15–19 (1977) (per curiam); Niemczyk v. Coleco Indus., Inc., 581 F. Supp. 717, 718 (N.D.N.Y. 1984).

Objectors next contend that the class cannot be certified because the Fisher/Lewis class opted out of the Speaks class. See [D.E. 255] 13–15.[15] This court's preliminary approval order, however, expressly prohibited group or class-wide opt-outs. See [D.E. 63] ¶ 18. Moreover, the Due Process Clause prohibits class-wide opt-outs. See, e.g, Sloan v. Winn Dixie Raleigh, Inc., 25 F. App'x 197, 198 (4th Cir. 2002) (per curiam) (unpublished); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1024–25 (9th Cir. 1998); Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 411–12 (2d Cir. 1975), abrogated on other grounds by Menowitz v. Brown, 991 F.2d 36 (2d Cir. 1993). Due process requires that class members be provided notice and an individual choice to proceed as a class member or to opt-out and avoid being bound by a judgment. See Hanlon, 150 F.3d at 1024; Berry Petroleum, 518 F.2d at 411–12. Objectors recognize this general principle but contend that the principle only applies before class certification and notice. See, e.g., [D.E. 132].

The court rejects this argument. The right to opt-out of a class action is an individual one and cannot be made by a class representative. See Hanlon, 150 F.3d at 1024; Smith v. SEECO, Inc., No. 4:14-CV-00435 BSM, 2017 WL 4570804, at *5 (E.D. Ark. Jan. 18, 2017) (unpublished) ("Even if class notice had been distributed, the requests would still be invalid because class representatives cannot opt out on behalf of the individual class members."), appeal docketed, No. 17-3443 (8th Cir.

---

[15] Linwood Scott, Jr. [D.E. 132], Cray Milligan [D.E. 133], Orville Wiggins [D.E. 160], Alford James Worley, Jr. [D.E. 176], Ralph Renegar [D.E. 188], Richard Renegar [D.E. 188-1], and Harold Wright [D.E. 199], class representatives from Fisher/Lewis, moved to exclude the entire Fisher/Lewis class from the proposed settlement.

Nov. 8, 2017); Smith v. CRST Van Expedited, Inc., No. 10–CV–1116–IEG (WMC), 2012 WL 5873701, at *3 (S.D. Cal. Nov. 20, 2012) (unpublished). Furthermore, the Fisher/Lewis class representatives are not lawyers and cannot assert any claims on behalf of anyone else. See, e.g., Myers v. Loudoun Cty. Pub. Sch., 418 F.3d 395, 400 (4th Cir. 2005); Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975) (per curiam).[16]

Rule 23 also requires the court to inquire about the adequacy of class counsel. Federal courts traditionally analyzed this issue under Rule 23(a)(4), but Rule 23(g) now governs. See Sheinberg v. Sorensen, 606 F.3d 130, 132 (3d Cir. 2010). Rule 23(g) requires the court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g); see Sheinberg, 606 F.3d at 132–33; Hodges v. Bon Secours Health Sys. Inc., Nos. RDB-16-1079, RDB-16-1150, 2016 WL 4447047, at *1 (D. Md. Aug. 24, 2016) (unpublished). Class counsel also must represent the interests of the class "fairly and adequately." Fed. R. Civ. P. 23(g)(4); see Sheinberg, 606 F.3d at 132–33; Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 212 (E.D. Va. 2015). The court appoints Leo Daughtry of Daughtry, Woodard, Lawrence, & Starling, and Gary K. Shipman of Shipman & Wright, LLP as class counsel. The court finds that class counsel meets these standards and fully and adequately

---

[16] Five class representatives in the Fisher/Lewis class did not opt out of the Speaks class: Archie Hill, C. Monroe Enzor, Jr., George Abbot, Robert C. Boyette, and Kendall Hill. See [D.E. 228] 61–62. Suppose those five class representatives in Fisher/Lewis wrote to this court and stated that they were not opting out of the Speaks action on behalf of themselves as individuals and as class representatives of the Fisher/Lewis class. Such a notice would be a nullity as to the Fisher/Lewis class. Opting out or remaining in a class action is an individual decision. See, e.g., Hanlon, 150 F.3d at 1024; see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 810–13 (1985); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173–74 (1974).

represents the settlement class. Notably, counsel has over twenty-years experience litigating class actions and has expended significant resources investigating and pursing the claims in this action.[17]

Objectors argue that class counsel is not adequate. Specifically, objectors contend that: (1) the Fisher/Lewis class members were not represented during the Speaks settlement negotiations; (2) the Cooperative's counsel did not request the Fisher/Lewis class counsel to mediate the interests of the Fisher/Lewis class members as required by the Fisher/Lewis case management order; (3) plaintiffs' counsel in Speaks lacked the authority to represent the interests of the Fisher/Lewis class members; (4) plaintiffs' counsel in Speaks showed a lack of understanding concerning patronage interests during the mediation; (5) the circumstances surrounding the proposed settlement evidence collusion between the Cooperative and plaintiffs' counsel in Speaks; and, (6) the proposed settlement in Speaks is against the interests of the Fisher/Lewis class members. See [D.E. 192] 12–14.

As for the first, second, third, and sixth objections, the Fisher/Lewis class members were adequately represented during the Speaks settlement negotiations. As discussed, these class members have the same interest as every other class member. The court rejects the contention that the Fisher/Lewis class members have some interest, separate and apart, from the interests of the other class members in this case. Moreover, if individuals in the Fisher/Lewis class did not want class counsel in Speaks to represent their interests, they had an opportunity, and a right, to opt out of this action and settlement. Furthermore, the Fisher/Lewis action does not bar the Speaks action, and the certification of the Fisher/Lewis class does not affect this federal action. See, e.g., 3 William B. Rubenstein, Newberg on Class Actions § 10:33 (5th ed. 2017) ("Class certification alone therefore

---

[17] Class counsel is experienced in class action litigation, certification, trial, and settlement. Counsel has been involved in numerous class action lawsuits in both state and federal court. These actions have included claims concerning unfair and deceptive practices, defective consumer products, and the Equal Credit Opportunity Act, among others. See [D.E. 217] 22–23.

has no formal effect on litigation elsewhere . . . ."). As for the assertion that by mediating this putative class action in federal court pursuant to this court's local rules, the parties or their counsel in this federal case violated the Fisher/Lewis case management order, the court already has explained the folly of that argument. See U.S. Const., art. VI, § 2; Howlett, 496 U.S. at 371; Donovan, 377 U.S. at 413–14.

As for the fourth objection, objectors offer no evidence in support of this bald proposition concerning patronage interest. Moreover, the theory of the case in Speaks is not tied to patronage interest and provides broader relief to the settlement class than the Fisher/Lewis case. The plaintiffs in Speaks allege that all class members are entitled to a portion of the Cooperative's reserves, regardless of whether they sold tobacco to the Cooperative in years in which the Cooperative was profitable.

As for alleged collusion, the parties mediated this federal case pursuant to this court's local rules with Judge Bullock, an experienced mediator who served with honor and distinction as a United States District Judge for the Middle District of North Carolina for 24 years.[18] In arguing that the parties and their counsel colluded, objectors essentially suggest that Judge Bullock was too blind to see collusion at the tip of his nose during the mediation, or that Judge Bullock was part of the collusion. The court rejects these insulting, baseless arguments accusing the parties, class counsel, defense counsel, or Judge Bullock of collusion. Judge Bullock reviewed briefings submitted by the parties and facilitated a two-day intense mediation that resulted in the proposed settlement. If the parties were going to collude or attempt to collude, the last person they would have asked to serve as a mediator is Judge Bullock. Judge Bullock is as smart and honorable as the universe is large.

_____

[18] Judge Bullock now practices at Womble Bond Dickinson, and is one of the most highly respected lawyers, judges, and mediators in North Carolina's history.

He would not and did not participate in a collusive mediation or permit one to take place in front of him.

2.

Rule 23(b)(3) allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In other words, Rule 23(b)(3) has two requirements: predominance and superiority. See Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).

As for predominance, the predominance requirement is "far more demanding than Rule 23(a)'s commonality requirement and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 362 (4th Cir. 2004) (quotation omitted); see Amchem, 521 U.S. at 623–24; Gray v. Hearst Commc'ns, 444 F. App'x 698, 700–01 (4th Cir. 2011) (unpublished); Thorn, 445 F.3d at 319. The main concern in the predominance inquiry is the balance between individual and common issues. See Brown v. Nucor Corp., 785 F.3d 895, 917–21 (4th Cir. 2015); Myers v. Hertz Corp., 624 F.3d 537, 549 (2d Cir. 2010).

Common issues of law and fact have been held to predominate "where the same evidence would resolve the question of liability for all class members." Beaulieu v. EQ Indus. Servs., Inc., No. 5:06–CV–00400–BR, 2009 WL 2208131, at *20 (E.D.N.C. July 22, 2009) (unpublished); see Stillmock v. Weis Mkts., 385 F. App'x 267, 273 (4th Cir. 2010) (unpublished); Gunnells, 248 F.3d at 428; Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003). Individualized damages do not alone defeat predominance. See, e.g., Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1232 (11th Cir. 2016); Gunnells, 348 F.3d at 427–28; Smilow, 323 F.3d at 40; Hart v.

44

Louisiana-Pac. Corp., No. 2:08-CV-47-BO, 2013 WL 12143171, at *2 (E.D.N.C. Mar. 29, 2013) (unpublished). Indeed, "Rule 23 explicitly envisions class actions with such individualized damage determinations." Gunnells, 348 F.3d at 428.

Class members' claims are based on common legal theories concerning a distribution of the Cooperative's reserves, dissolution of the Cooperative, and a declaratory judgment about whether the Cooperative violated federal and state law. Moreover, all claims are directly linked to their membership in the Cooperative or the actions of the Cooperative vis-a-vis their membership. See Am. Compl. ¶¶ 1, 21–23, 78–102. Furthermore, the individualized issues only relate to calculating damages. Here, questions of law and fact common to class members predominate over any questions affecting the damages of individual members, and that issue does not defeat predominance. See, e.g., Gunnells, 348 F.3d at 427–28; Minter v. Wells Fargo Bank, N.A., 274 F.R.D. 525, 556 (D. Md. 2011) ("Rule 23(b)(3) specifically contemplate[s] individualized calculations of damages."); 2 William B. Rubenstein, Newberg on Class Actions § 4:54 (5th ed. 2017) ("[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations . . . .").

As for the superiority requirement, plaintiffs must be able to demonstrate that proceeding as a class "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see Thorn, 445 F.3d at 319. In assessing superiority, courts should consider the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); see Thorn, 445 F.3d at 319. Courts should consider "whether Rule 23 is

sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." Stillmock, 385 F. App'x at 274 (quotation omitted). However, on a request for a settlement-only class certification, the court need not consider the likely difficulties in managing a class action. See Amchem, 521 U.S. at 620; Carter v. Forjas Taurus, S.A., 701 F. App'x 759, 765 (11th Cir. 2017) (per curiam) (unpublished); Decohen, 299 F.R.D. at 476.

The superiority requirement is met. As for the first factor, the burden and expense of individual litigation, and the legal and practical difficulty of proving individual claims concerning events that occurred many years ago, make it highly unlikely that individual class members could obtain the relief achieved in this settlement if they were forced to proceed on their own.

As for the second factor, although there are no individual claims pending, there is the competing Fisher/Lewis class action pending in Wake County Superior Court. The competing Fisher/Lewis class action is not a bar to finding superiority. This case involves a nationwide class of plaintiffs and substantial questions of federal law. Thus, this court is a superior forum for resolving the claims at issue. See, e.g., Blair, 181 F.3d at 838 (recognizing that a court in the second-filed case may be the superior vehicle for resolving the claims).

As for the third factor, this court presents a desirable forum for litigating these claims. The Cooperative is headquartered in the Eastern District of North Carolina, substantially all of the relevant records are located in the Eastern District of North Carolina, and many of the Cooperative's past and present members reside in the 44 counties within the Eastern District of North Carolina, other federal judicial districts in North Carolina, or other federal judicial districts in nearby states. See, e.g., Tedesco v. Mishkin, 689 F. Supp. 1327, 1337 (S.D.N.Y. 1988).

The court finds that the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) are

met. Thus, the court certifies the settlement class. See, e.g., Velasquez-Moterrosa, 2016 WL 1703351, at \*7; Decohen, 299 F.R.D. at 476–77, 485–86; In re Serzone Prods. Liab. Litig., 231 F.R.D. 221, 236–37, 246 (S.D. W. Va. 2005).

## IV.

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The primary concern of Rule 23(e) is "the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." In re Jiffy Lube Secs. Litig., 927 F.2d 155, 158 (4th Cir. 1991). Courts generally follow a two-step procedure in reviewing the proposed settlement. See Beaulieu, 2009 WL 2208131, at \*23; Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 855 F. Supp. 825, 827 (E.D.N.C. 1994). First, the court determines whether there is "probable cause to notify the class of the proposed settlement." Horton, 855 F. Supp. at 827 (quotation omitted); see Armstrong v. Bd. Sch. Dir. of Milwaukee, 616 F.2d 305, 314 (7th Cir. 1980), overruled on other grounds by Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998). Second, after notice has been sent to putative class members, the court conducts a final fairness hearing at which "all interested parties are afforded an opportunity to be heard on the proposed settlement." Horton, 855 F. Supp. at 827. Before a court can approve a proposed settlement, it must find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); see Berry, 807 F.3d at 615; In re Jiffy Lube, 927 F.2d at 158. "The fairness analysis is intended primarily to ensure that a settlement is reached as a result of good-faith bargaining at arm's length, without collusion." Berry, 807 F.3d at 614 (quotation and alteration omitted).

## A.

In assessing the adequacy of the proposed settlement courts consider the following factors:

47

"(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." In re Jiffy Lube, 927 F.2d at 159; see Berry, 807 F.3d at 614; Scardelletti v. Debarr, 43 F. App'x 525, 528 (4th Cir. 2002) (per curiam) (unpublished); McLaurin v. Prestage Foods, Inc., No. 7:09-CV-100-BR, 2011 WL 13146422, at *4 (E.D.N.C. Nov. 9, 2011) (unpublished). The most important factor is the relative strength of plaintiffs' claims on the merits, which also encompasses an evaluation of the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial. See, e.g., Berry, 807 F.3d at 614–15. In evaluating the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, the court "must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." Strickland v. Washington, 466 U.S. 668, 695 (1984).[19] No party is entitled to "luck of a lawless decisionmaker . . . ." Id. Rather, the analysis must "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." Id.

In conducting its fairness analysis, a court need not "reach any dispositive conclusions" concerning the merits of the case. Flinn v. FMC Corp., 528 F.2d 1169, 1172 (4th Cir. 1975). Here, the court's review of the facts and law demonstrates that the plaintiffs' claims are weak, and the

---

[19] In Strickland, the Supreme Court discussed these principles in connection with a reviewing court's analysis of alleged prejudice arising from a Sixth Amendment ineffective assistance of counsel claim. See Strickland, 466 U.S. at 695. These principles apply with equal force in a reviewing court's "fairness" analysis under Rule 23 of the relative strength of plaintiffs' claims and defendant's defenses.

likelihood of recovery if plaintiffs litigated this case to final judgment and final appeal is low. See, e.g., Berry, 807 F.3d at 615. Plaintiffs' amended complaint includes numerous claims seeking relief pursuant to both federal and state law. In support of these claims, plaintiffs cite 28 U.S.C. § 2201, 7 U.S.C. § 519, N.C. Gen. Stat. § 55A-13-02(c), and N.C. Gen. Stat. §§ 55A-14-30, et seq. See Am. Compl. ¶¶ 15, 38–41, 78–102. None of these statutes, however, appear to entitle plaintiffs to the requested relief. Moreover, plaintiffs and the objectors have not cited any other provision within these statutes, other statutes, or any contract or common law doctrine under federal or North Carolina law that would entitle them to relief.

The Cooperative is organized under the Cooperative Marketing Act. See N.C. Gen. Stat. § 54-129. The Marketing Act provides that an association may be organized "to engage in any activity in connection with the producing, marketing or selling of the agricultural products of its members and other farmers . . . ." Id. § 54-132. The Marketing Act also provides that associations have the power to "establish reserves and to invest the funds thereof in bonds or such other property as may be provided in the bylaws." Id. § 54-151(5). In 1979, the Cooperative amended its Articles of Incorporation to include a specific provision stating, "[t]he corporation shall have the right to establish and maintain a capital reserve for the future conduct of its business." Articles of Incorporation [D.E. 229-2] 23. Before this 1979 amendment, and since the time of incorporation in 1946, the Articles of Incorporation stated that the Cooperative has "all powers, privileges and rights conferred on ordinary corporations and cooperative marketing association by the laws of this state . . . ." Articles of Incorporation [D.E. 229-2] 6–7. As stated, the Marketing Act confers the power to establish reserves. See N.C. Gen. Stat. § 54-151(5). Moreover, from its inception, the Cooperative's By-laws provided it with the express power to establish and maintain reserves. See By-laws Art. XVI [D.E. 229-3] 11. Furthermore, the depositions of the named representatives in the

49

Fisher/Lewis case, and objector, Pender Farms, confirm that they have long understood the broad scope of the Cooperative's power to retain reserves and that the Cooperative had fully disclosed to its members for decades that it was retaining reserves. See Kay Fisher Dep. at 7 [D.E. 228-20]; Daniel Lewis Dep. at 6 [D.E. 228-21]; Whitney King Dep. at 7 [D.E. 228-22]; Pender Sharp Dep. at 20 [D.E. 228-8].

As for the statutes cited in the amended complaint, FETRA does not appear to entitle plaintiffs to relief.[20] Specifically, section 519(b) provides the Cooperative with the authority to dispose of the loan tobacco that was ceded to it from the CCC. See 7 U.S.C. § 519(b). In contrast, subsections (c) and (d) direct that funds in the Cooperative's No Net Cost account be applied to the outstanding CCC loans, and that any remaining funds be transferred to the Cooperative for distribution to "producers of quota tobacco in accordance with a plan approved by the Secretary." Id. §§ 519(c), (d). In accordance with subsection (b), the CCC ceded approximately 83 million pounds of tobacco to the Cooperative. See Kacsuta Decl. ¶ 29. In accordance with subsection (d), the CCC transferred approximately $7 million from the No Net Cost account to the Cooperative. See Hill Decl. ¶ 28. As for the $7 million from the No Net Cost account, the Cooperative distributed those proceeds directly to the producers as Congress directed. See Kacsuta Decl. ¶ 30. As for the ceded loan tobacco, the Cooperative sold this tobacco for approximately $81 million and retained the proceeds as reserves. See id. ¶ 29. The plain language of FETRA makes clear that the Cooperative was entitled to retain the proceeds from the sale of the loan tobacco. See 7 U.S.C. § 519(b). Indeed, consistent with FETRA, on March 21, 2005, the USDA sent a letter to the

---

[20] Plaintiffs also cite the federal Declaratory Judgment Act. The federal Declaratory Judgment Act, 28 U.S.C. § 2201, is procedural and does not provide an independent cause of action. See, e.g., Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S. Ct. 843, 849 (2014).

Cooperative expressly stating that the Cooperative "may utilize [the ceded tobacco] in any manner that it desires." [D.E. 123-16] 2. If Congress wanted to require the proceeds to be transferred to the producers it would have said so explicitly, as it did in subsection (d) concerning the No Net Cost funds. See, e.g., Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotation omitted)). Moreover, FETRA does not appear to include a private federal cause of action, see Lay, 312 F. App'x at 757 (Moore, J., concurring), and the statute cannot be interpreted to "disclose the intent to create one." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 164 (2008). Accordingly, FETRA will not provide plaintiffs with the relief they seek.[21]

As for N.C. Gen. Stat. § 55A-13-02(c), this statute specifically provides that, "a corporation other than a charitable or religious corporation may make distributions to purchase its memberships." (emphasis added). Objectors cite no authority to convince the court that this statute requires distributions. Moreover, the Marketing Act permits the Cooperative to retain reserves and does not place a limit on the size of the reserves. See N.C. Gen. Stat. § 54-151(5). Furthermore, objectors have not cited any contractual term, by-law, article of incorporation, or anything else, that would provide plaintiffs in this action or the Fisher/Lewis action with any of the requested relief.

Without statutory or contractual entitlement to relief, plaintiffs' claim concerning unreasonable reserves amounts to a claim that the Cooperative's Board breached their fiduciary

---

[21] Once FETRA allocated the ceded tobacco to the Cooperative, any state law claim to that property would appear to be pre-empted to the extent of any conflict between federal and state law. See, e.g., Hillman v. Maretta, 569 U.S. 483, 490, 492–99 (2013). Thus, federal law would appear to preempt any effort to use state law to require the Cooperative to distribute the proceeds of the sale of the ceded tobacco to the plaintiffs. See id.

duties in failing to distribute reserves. Plaintiffs' first hurdle to relief would be to convince the court

that a fiduciary relationship existed between them and the Cooperative's Board of Directors. Under

North Carolina law, "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary

relationship between the parties." Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001).

A fiduciary relationship "exists in all cases where there has been a special confidence reposed in one

who in equity and good conscience is bound to act in good faith and with due regard to the interests

of the one reposing confidence." Abbitt v. Gregory, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931);

see HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991).

The existence of a fiduciary relationship often depends on the circumstances of each case. HAJMM,

328 N.C. at 588, 403 S.E.2d at 489. In Rigby v. Flue-Cured Tobacco Cooperative Stabilization

Corporation, a group of plaintiffs brought nearly identical claims against the Cooperative in Georgia

state court, including a claim for forced distribution of the Cooperative's reserves. The trial court

held that, under North Carolina law, directors of Cooperatives generally do not owe fiduciary duties

to individual members, and no special circumstances existed between the plaintiffs and the

Cooperative to give rise to a fiduciary relationship. See Trial Court Order, July 13, 2015 [D.E. 73-

17] 5–6. The Georgia Court of Appeals affirmed this holding under both Georgia and North

Carolina law, noting that there was no "special confidence" between the Cooperative and its

members that would warrant imposition of fiduciary duties. See Rigby v. Flue-Cured Tobacco Coop.

Stabilization Corp., 339 Ga. App. 558, 562–63, 794 S.E.2d 413, 417–18 (2016).

Even if plaintiffs could prove that a fiduciary relationship exists between the Cooperative and

plaintiffs, breach of fiduciary duty claims fall within North Carolina's business judgment rule. See,

e.g., Ehrenhaus v. Baker, 216 N.C. App. 59, 82–83, 717 S.E.2d 9, 25–26 (2011); Winters v. First

Union Corp., 2001 NCBC 08, 2001 WL 34000144, at *5 (N.C. Super. Ct. July 13, 2001)

52

(unpublished). North Carolina's business judgment rule applies to cooperatives. See Hammonds v. Lumbee River Elec. Membership Corp., 178 N.C. App. 1, 20–22, 631 S.E.2d 1, 13–14 (2006). The business judgment rule:

> operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

State v. Custard, 2010 NCBC 6, 2010 WL 1035809, at *18 (N.C. Super. Ct. Mar. 19, 2010) (unpublished) (quotation omitted). Plaintiffs bear the burden to show directors are not entitled to protection of the business judgment rule. See, e.g., id. at 22; Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993).[22] If plaintiffs fail to rebut the presumption, the business judgment rule attaches and courts will not question the decisions of the directors absent proof of complete irrationality. See HAJMM Co. v. House of Raeford Farms, Inc., 94 N.C. App. 1, 10, 379 S.E.2d 868, 873 (1989) (The business judgment rule protects directors from "being judicially second guessed when they exercise reasonable care and business judgment."), aff'd in part, rev'd in part on other grounds, 328 N.C. 578, 403 S.E.2d 483 (1991).

The Cooperative's Board foresaw FETRA's implementation and elected to retain reserves so that the Cooperative could continue to support its members when the Tobacco Price Support Program ended. See Shepherd Decl. ¶¶ 14–17. In 2005, post-FETRA, the Board considered distributing a portion of its reserves to members, but elected to retain the reserves so that it could continue to support its members. See Hill Decl. ¶¶ 31–34. The Board made this decision after

---

[22] North Carolina courts frequently look to Delaware case law for guidance on issues concerning corporate governance. See Custard, 2010 WL 1035809, at *18 (collecting cases).

Kenneth Bopp, the Cooperative's Chief Financial Officer, presented a five-year financial analysis and described the need to maintain the reserves for operations in order to support its members. See id. ¶ 34. Plaintiffs and the objectors did not present evidence that the directors acted out of self-interest or that they did not have an honest belief that retaining reserves was in the best interest of the Cooperative and its members. See, e.g., Winters, 2001 WL 34000144, at *4; Solomon v. Armstrong, 747 A.2d 1098, 1111–12 (Del. Ch. 1999). Accordingly, it is highly unlikely that plaintiffs would be able to overcome the business judgment rule and force the Cooperative to distribute all or some of its reserves or other assets. See, e.g., Happ v. Creek Pointe Homeowner's Ass'n, 215 N.C. App. 96, 105, 717 S.E.2d 401, 407 (2011); see also Lake Region Packing Ass'n, Inc. v. Furze, 327 So.2d 212, 214–17 (Fla. 1976); Claassen v. Farmers Grain Coop., 208 Kan. 129, 131–34, 490 P.2d 376, 379–81 (1971).[23]

As for plaintiffs' claim for judicial dissolution under N.C. Gen. Stat. § 55A-14-30, this claim is similarly weak. The statute provides that a court may dissolve a corporation if:

(a) The directors are deadlocked in the management of the corporate affairs, and the members, if any, are unable to break the deadlock; (b) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent; (c) The members are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have, or would otherwise have, expired; (d) The corporate assets are being misapplied or wasted; or (e) The corporation is no longer able to carry out its purposes.

N.C. Gen. Stat. § 55A-14-30(a)(2). Subsections (a) and (c) do not apply because there is no alleged deadlock. As for subsection (b), plaintiffs conclusorily allege that the Board acted "oppressively." See Am. Compl. ¶ 101. The court doubts that this claim would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) because the well-pleaded facts do not give rise to any

---

[23] These principles apply equally to the Fisher/Lewis class action.

plausible inference of oppressive behavior. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007). Moreover, this court's extensive review of the record shows that the Cooperative's Board did not act "oppressively." To the contrary, the Cooperative's Board has worked diligently to pursue new markets and new strategies so that the Cooperative can continue to operate and support its members. See, e.g., Kacsuta Decl. ¶¶ 31–41; Shepherd Decl. ¶¶ 16–19. To the extent plaintiffs contend that "illegal, oppressive, or fraudulent" means "unreasonably," plaintiffs cite nothing to suggest the Supreme Court of North Carolina would rewrite the clear and unambiguous statutory language in N.C. Gen. Stat. § 55A-14-30(a)(2)(b) to mean "unreasonably." Cf. Brown v. Flowe, 349 N.C. 520, 522, 507 S.E.2d 894, 895–96 (1998) (holding that clear and unambiguous words in a statute should be given their plain meaning); Correll v. Div. of Soc. Servs., 332 N.C. 141, 144, 418 S.E.2d 232, 235 (1992) (same). Furthermore, and in any event, even if the Supreme Court of North Carolina rewrote subsection (b) to mean "unreasonably," the likelihood that plaintiffs could establish that the directors acted unreasonably is low. Thus, the likelihood that plaintiffs can establish that the directors acted "oppressively" is essentially zero.

As for subsection (d), plaintiffs conclusorily allege that the corporate assets are being misapplied or wasted. See Am. Comp. ¶ 101. Waste "entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." Gao v. Sinova Specialties, Inc., 2016 NCBC 103, 2016 WL 7852490, at *12 (N.C. Super. Ct. Dec. 21, 2016) (unpublished); see Krieger v. Johnson, 2014 NCBC 13, 2014 WL 1759054, at *7 (N.C. Super. Ct. Apr. 30, 2014) (unpublished); Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997). The court doubts that this claim would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) because the well-pleaded facts do not give rise to any

55

plausible inference of waste. See, e.g., Iqbal, 556 U.S. at 677–80; Twombly, 550 U.S. at 554–63. Moreover, this court's extensive review of the record shows that the Cooperative's Board has not wasted or misapplied the Cooperative's assets. See, e.g., Kacsuta Decl. ¶¶ 31–41; Shepherd Decl. ¶¶ 16–19.

As for subsection (e), the Cooperative's Articles of Incorporation permit it to engage in "any activity involving or relating to . . . financing, marketing, selling, and/or distribution . . . of flue-cured tobacco . . . ." Articles of Incorporation [D.E. 229-2] 2. Based on this court's extensive review of the record, the Cooperative is still actively carrying out its purpose. Specifically, the Cooperative has purchased a tobacco and manufacturing facility to sell and promote its own products. See Kacsuta Decl. ¶¶ 34, 36. Moreover, the Cooperative is selling its products overseas to increase demand for its members' products and has launched its own cigarette brand. See id. ¶¶ 35–36. To the extent the plaintiffs rely on FETRA as a basis for dissolution, that claim is similarly weak. As stated, FETRA does not provide the plaintiffs with any basis for relief, and FETRA has not eliminated the Cooperative's purpose and does not require dissolution of the Cooperative. Accordingly, plaintiffs' claim for judicial dissolution is weak.

As for the second factor, difficulties of proof and strong defenses, this factor weighs heavily in favor of finding adequacy. See Berry, 807 F.3d at 615. The statute of limitations is a substantial barrier to large swaths of plaintiffs' claims. See N.C. Gen. Stat. § 1-56. Section 1-56 provides that, "[a]n action for relief not otherwise limited by this subchapter may not be commenced more than 10 years after the cause of action has accrued." Id. Plaintiffs claim that they are entitled to a portion of the Cooperative's reserves that were derived from the 1967–1973 and 1982–1984 crop years. See Am. Compl. ¶¶ 11–15. In 1992, the CCC released to the Cooperative the remainder of the tobacco from these crop years. See Kacsuta Decl. ¶ 26. Accordingly, claims concerning reserves generated

56

from these crop years should have been brought by 2002.[24] Although the statute of limitations may not bar plaintiffs' claims concerning tobacco released under FETRA, the statute of limitations profoundly reduces any potential for recovery concerning earlier crop years. See Rigby v. Flue-Cured Tobacco Coop. Stabilization Corp., 327 Ga. App. 29, 38–40, 755 S.E.2d 915, 923–25 (2014) (affirming the trial court's dismissal of claims related to the 1967–1973 crop years as time-barred).

Plaintiffs' litigation risk also has substantially changed since plaintiffs initially filed their complaint in 2012. As mentioned, in Rigby v. Flue-Cured Tobacco Cooperative Stabilization Corporation, a group of plaintiffs brought nearly identical claims against the Cooperative in Georgia state court, including a claim for forced distribution of the Cooperative's reserves. See Def. Exhs. 12–17 [D.E. 73-13–73-18]. The Cooperative vigorously litigated and prevailed on every claim, and the plaintiffs recovered nothing. The trial court held that it had no legal authority to force the Cooperative to distribute its reserves. See Trial Court Order, June 15, 2012 [D.E. 73-13] 9–10. The trial court also examined N.C. Gen. Stat. § 54-151(5) and the Cooperative's governing documents, and concluded that they expressly permit the Cooperative to retain reserves. See id. The trial court also held that the Cooperative did not owe a fiduciary duty to its members. See Trial Court Order, July 13, 2015 [D.E. 73-17]. On appeal, the Georgia Court of Appeals affirmed all of the trial court's rulings. See Rigby, 327 Ga. App. at 42, 755 S.E.2d at 926; Rigby, 339 Ga. App. at 558, 563–64, 794 S.E.2d at 414, 417–18.

As for the anticipated duration and expense of additional litigation, this factor weighs in

---

[24] The Fisher/Lewis plaintiffs instituted their action in 2005. Thus, those plaintiffs face the same barrier. In fact, the deposition of Pender Sharp appears to doom any claim to funds from the 1967–1973 crop years or the 1982–1984 crop years. See Sharp Dep. at 17.

favor of settlement. Proceeding to trial and through final appeal would take substantial time and resources, and the likelihood of recovery is small in light of the weakness of plaintiffs' case on the merits. See, e.g., In re Genworth Fin. Servs. Litig., 210 F. Supp. 3d 837, 842 (E.D. Va. 2016). As for the solvency of the Cooperative, this factor is neutral because the Cooperative is solvent.

As for the degree of opposition to the settlement, courts consider "both the nature and merits of objections and the proportion of class members who object." 4 William B. Rubenstein, Newberg on Class Actions § 13:54 (5th ed. 2017); cf. Bennett v. Behring Corp, 737 F.2d 982, 988 (11th Cir. 1984). As for the proportion, the class includes over 800,000 past and present members of the Cooperative. The class notice reached approximately 74% of class members directly. See Shannon R. Wheatman 4th Decl. [D.E. 217-5] ¶ 13. Here, 84 class members requested exclusion and 72 filed objections. See [D.E. 217-6] 15; [D.E. 228] 37; Fairness Hr'g Tr. at 6.[25] Thus, the number of exclusions and objections is very small compared to the size of the class. See, e.g., D'Amato v. Deutsche Bank, 236 F.3d 78, 86–87 (2d Cir. 2001). As for the merits of the objections, none of the objections address the strength of plaintiffs' claims on the merits or adequately explain how class members can recover anything approaching $24 million if this case proceeds to final judgment and final appeal. Moreover, many of the objections use similar language or similar forms, which is evidence that some of the objections are the product of "an organized campaign." See, e.g., In re

---

[25] This figure does not include four untimely objections [D.E. 262, 263, 264, 266]. Jeff Frye filed one of these untimely objections [D.E. 262]. Frye also testified at the fairness hearing. Frye contends that the Cooperative violated the antitrust laws and that farmers are entitled to $4.72 billion in damages. See Fairness Hr'g Tr. at 30; [D.E. 262] 5. This argument fails. See, e.g., 7 U.S.C. §§ 291–92; N.C. Gen. Stat. § 54-141; Strickland, 643 F. Supp. at 321; Bailey v. Flue-Cured Tobacco Coop. Stabilization Corp., 158 N.C. App. 449, 453–57, 581 S.E.2d 811, 814–16 (2003). Moreover, Frye's objection does not concern the settlement agreement.

Serzone Prods., 231 F.R.D. at 245–46.[26] Accordingly, this factor weighs in favor of settlement.

1.

Objectors make numerous arguments concerning the adequacy of the $24 million settlement. First, objectors contend that the $24 million proposed settlement is inadequate when compared to the size of the Cooperative's assets and reserves. These objections misstate the character of the Cooperative's assets and reserves. As of April 30, 2017, the Cooperative had approximately $522 million in assets, but only approximately $11.5 million was cash or cash equivalents. See Def. Ex. F, Audited Financial Statements [D.E. 228-7]. Moreover, although the Cooperative had approximately $129 million in investments, the Cooperative used these investments as collateral for the Cooperative's line of credit, which the Cooperative uses to support its members and its operations. See Kacsuta Decl. ¶ 71. Furthermore, the Cooperative had approximately $52 million in accounts receivable, which represents money owed to the Cooperative, not cash. See Audited Financial Statements. The Cooperative's remaining assets are not readily liquid. See id.; Kacsuta Decl. ¶ 70. More fundamentally, simply because the Cooperative has assets and reserves does not legally entitle the current or former members of the Cooperative to them.

Objectors next contend that the settlement is not adequate because, in 2005, the presiding North Carolina Superior Court Judge in the Fisher/Lewis action rejected as unreasonable a proposed settlement of $76 million. See, e.g., [D.E. 192] 16–17. The court rejects this argument for numerous reasons. First, the presiding North Carolina Superior Court Judge did not find that the proposed settlement was unreasonable. To the contrary, the presiding North Carolina Superior Court Judge

[26] For example, Charles Worley, a named plaintiff in the Fisher/Lewis action, filed an objection on a form that was used by additional objectors. Compare Charles Worley Objection [D.E. 100], with, e.g., [D.E. 101]; [D.E. 104]; [D.E. 107]; [D.E. 109]; [D.E. 111]; [D.E. 114].

59

denied the motion for preliminary approval of the proposed settlement "without prejudice" after the Fisher plaintiffs objected and argued, inter alia, that discovery was needed concerning the merits of the proposed settlement. Specifically, the presiding North Carolina Superior Court Judge denied the motion of the Lewis plaintiffs for certification of a settlement class and preliminary approval of the proposed class action settlement "without prejudice to the right of the Lewis Plaintiffs to bring the proposed Settlement back to the court for further consideration at an appropriate time[,]" and gave the Fisher plaintiffs additional time for discovery. See [D.E. 70-2] 3–5.

Second, settlement offers are merely offers to compromise and do not reflect the relative strength of the plaintiffs' claims on the merits, and they are not admissible at trial to establish liability. Fed. R. Evid. 408 (settlement offers may not be used as evidence "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction"); see id., Advisory Committee Note to 1972 Proposed Rules ("The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position."); Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 653–55 (4th Cir. 1988). The 2005 proposed settlement offer occurred shortly after FETRA's implementation, and when great uncertainty existed concerning the Cooperative's future and FETRA's impact on member-growers. See Hill Decl. ¶¶ 31–35. The Cooperative's Board approved the 2005 proposed settlement offer in order to appease current and former member-growers and to quickly end the litigation as the Board and the Cooperative prepared to move forward in the post-FETRA world. See id. ¶¶ 35–36. The 2005 proposed settlement offer did not reflect the Board's view as to the merits of the claim. See id. ¶¶ 35, 37; cf. Fed. R. Evid. 408. Moreover, as discussed, the 2005 proposed settlement offer has little relevance in 2018 because the litigation risks have substantially changed in the Cooperative's favor since 2005, and the Cooperative's business strategy from 2005 to 2017

60

has proven reasonable and beneficial to the Cooperative's members.

Objectors also contend that the settlement class is too broad and that it should not include class members who joined the Cooperative after 2004 because these members did not pay the annual assessments required by the No Net Cost Act. The court rejects this argument because the annual assessments did not belong to the member-growers or the Cooperative, and the assessments were not put in the Cooperative's reserves. See Hill Decl. ¶ 19; Batten Decl. ¶ 6. Instead, the Cooperative served as a middle-man and collected the assessments for the CCC. See Hill Decl. ¶ 19; Strickland, 643 F. Supp. at 318. Accordingly, the court rejects these arguments.

2.

On January 5, 2018, the North Carolina Department of Agriculture & Consumer Services and the South Carolina Department of Agriculture (the "Departments") moved for leave to file an amicus curiae brief. See [D.E. 215]. The brief includes arguments concerning the timing of the settlement, the adequacy of class representatives, and the adequacy of the $24 million proposed settlement. See [D.E. 215-1].

The court finds the brief unpersuasive for numerous reasons. On January 16, 2018, the North Carolina Agriculture Commissioner was deposed in his official capacity concerning the arguments in the brief. See Commissioner Dep. [D.E. 249-4]. The Commissioner's deposition testimony reveals that his attorneys and staff did not provide him with any details concerning the Speaks case, the Fisher/Lewis case, the Rigby case, or the profound litigation risk of recovering zero that the Speaks class and the Fisher/Lewis class face if they litigate to final judgment and final appeal. The brief contends, for example, that the $24 million settlement is unfair in light of the Cooperative's total assets which allegedly exceed $500 million. See [D.E. 215-1] 14–15. The Commissioner admitted, however, that he has not seen the Cooperative's financial statements and does not know

whether the Cooperative's assets exceed its liabilities. See Commissioner Dep. at 103–04. The Commissioner also admitted that he does not know what portion of the Cooperative's assets are held as reserves, or whether the Cooperative has any reserves at all. See id. at 111–12. The Commissioner also admitted that he is not a lawyer, and has not heard of the Rigby case or how the member-growers in Rigby litigated nearly identical claims to final judgment and final appeal in Georgia and recovered zero. See id. at 85. The brief also cites the $76 million proposed settlement figure from 2005 in the Fisher/Lewis action, but the Commissioner admitted that he does not know when the Cooperative made that settlement offer, why it made the settlement offer, or whether events over the past decade have made that offer obsolete. See id. at 86–87.

In considering the amicus brief, this court notes that the Departments do not have a financial stake in the outcome of the Speaks action or the Fisher/Lewis action. If the cases are litigated to final judgment and final appeal, and the recovery is zero (as in Rigby), the Departments will not be financially affected. Likewise, if the cases are litigated to final judgment and final appeal, and the plaintiffs recover something, the Departments will not be financially affected. After all, the Departments are not class members. The Commissioner, as an individual, however, is a class member in the Speaks action. As such, the Commissioner had a right, and an opportunity to opt out of the Speaks action and settlement and to litigate his claims through final judgment and final appeal. Yet, in his individual capacity, the Commissioner did not opt out of the Speaks action. Having fully considered the amicus brief, the court finds that the arguments in the amicus curiae brief do not warrant rejecting the settlement.[27]

_____

[27] Other arguments in the amicus curiae brief duplicate the arguments objector Pender Farms made through counsel. The court has addressed those other arguments in this order.

## B.

In assessing the fairness of the proposed settlement, courts consider the following factors: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of . . . class action litigation." In re Jiffy Lube, 927 F.2d at 159; see Berry, 807 F.3d at 614; Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 460 (D. Md. 2014). The fairness analysis ensures the "settlement is reached as a result of good-faith bargaining at arm's length, without collusion." Berry, 807 F.3d at 614.

The court has thoroughly considered all of the fairness factors and finds this settlement was reached "as a result of good-faith bargaining at arm's length, without collusion." Id. As mentioned, the Speaks plaintiffs filed this putative federal class action on October 31, 2012. See [D.E. 1]. Upon joint motion, the court agreed to stay the case pending resolution of class certification in the Fisher/Lewis action. See [D.E. 18]. That process took much longer than this court anticipated. After the Supreme Court of North Carolina's affirmance of the Fisher/Lewis class certification, the parties in this case began to engage in settlement discussions. See [D.E. 228] 31. Pursuant to this court's local rules, the parties mediated this case with Judge Bullock. See id. As part of that process, the parties submitted mediation statements to Judge Bullock, and the Cooperative produced documents that the plaintiffs requested. See id. The mediation statements described the parties' positions, as well as legal analyses concerning the claims. See id. at 32. The mediation lasted for two days in May 2017 and provided both parties with the opportunity to consider the strengths and weaknesses of the plaintiffs' claims and the defendant's defenses. As a result of these intense arms-length negotiations, the parties were able to compromise and agree on a proposed settlement. See [D.E. 217] 21–22; [D.E. 228] 111–13.

Objectors argue that the settlement is not fair. First objectors contend that the settlement is unfair because limited discovery has occurred in this proceeding. See [D.E. 255] 18–19. Limited or informal discovery, however, does not preclude a finding of fairness. See, e.g., D'Amato, 236 F.3d at 87; Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239–40 (9th Cir. 1998). Here, the parties engaged in informal discovery and class counsel received numerous documents from the Cooperative. See [D.E. 217] 20; [D.E. 228] 31. The mediation process provided class counsel with sufficient information about the merits of the case. See [D.E. 217] 21. Class counsel also is familiar with much of the underlying evidence having previously served as class counsel for the putative Lewis class in the Fisher/Lewis action. See id. at 11. Moreover, the unresolved issues in this case are primarily legal, and do not depend on additional discovery. Considering the arms-length mediation with Judge Bullock, informal discovery, and class counsel's extensive knowledge of the strengths and weaknesses of the case, the court rejects the argument that additional discovery was required before settlement. See, e.g., In re NFL Players Concussion Injury Litig., 821 F.3d 410, 436–37 (3d Cir. 2016); Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 639 (5th Cir. 2012); Linney, 151 F.3d at 1239–40.

Next, objectors argue that the settlement is the product of collusion. See [D.E. 255] 19–20; [D.E. 192] 14. Objectors specifically contend that, "[t]he circumstances surrounding the intentional delay to this case was to set up mechanism for [the Cooperative] to avoid consequences of the North Carolina Supreme Court affirming the certification of the Lewis-Fisher class." [D.E. 255] 20. As discussed, the court categorically rejects the argument accusing the parties, class counsel, defense counsel, or Judge Bullock of collusion. See, e.g., Gallucci v. Gonzales, 603 F. App'x 533, 534 (9th Cir. 2015) (unpublished) ("[T]he Settlement was negotiated with the aid of a retired magistrate judge and experienced mediator, who reported no evidence of collusion."); In re Penthouse Exec. Club

64

Comp. Litig., No. 10 Civ. 1145(KMW), 2013 WL 1828598, at *2 (S.D.N.Y. Apr. 30, 2013) (unpublished); 4 William B. Rubenstein, Newberg on Class Actions § 13:14 (5th ed. 2017). Tellingly, objectors cite no evidence of collusion. Instead, objectors suggest that the timing of the settlement raises an inference of collusion. The court rejects this inference.

As discussed at length, plaintiffs' claims are profoundly weak on the merits, and the litigation risk is high. The $24 million settlement is fair, reasonable, and adequate. Moreover, the timing of the settlement does not undermine this conclusion, and it does not provide evidence that the parties engaged in a "reverse auction." The Cooperative did not pit plaintiffs' attorneys in competing class actions against each other in order to get the lowest bid. Cf. Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1189 (10th Cir. 2002) (" Objectors reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a 'collusive reverse auction.'" (quotation omitted)).

Next, objectors cite an interlocutory order that the presiding North Carolina Superior Court Judge in the Fisher/Lewis action issued on January 17, 2018. The North Carolina Superior Court Judge did not have the benefit of the extensive record that this court has to assess the fairness, reasonableness, and adequacy of the proposed settlement. Nevertheless, the North Carolina Superior Court Judge opined that the proposed settlement in this federal action is not fair or adequate under North Carolina Rule of Civil Procedure 23(c). See State Court Order, Jan. 17, 2018 [D.E. 252-2]. The North Carolina Superior Court Judge also opined that there is evidence that plaintiffs' counsel and defense counsel in Speaks colluded to exclude the Fisher/Lewis counsel from the federal mediation and to mislead Fisher/Lewis class members in the class notice in Speaks. See id.

At the fairness hearing in this federal case, Pender Farms, through counsel (the same counsel

who represents the plaintiffs in Fisher/Lewis), argued that the North Carolina Superior Court Judge's interlocutory order is "binding" on this court under 28 U.S.C. § 1738.[28] Pender Farms failed to explain, however, how the interlocutory order of the North Carolina Superior Court Judge is binding on this court, and did not cite any cases in support of this argument.[29] Section 1738 directs federal courts "to treat a state court judgment with the same respect that it would receive in the courts of the rendering state." Matsushita Elec. Indus., 516 U.S. at 373. In Matsushita, the Supreme Court held that a state-court judgment approving a class-action settlement was entitled to full faith and credit in a competing putative class action in federal court under 28 U.S.C. § 1738, even though the state-court judgment released claims that were within the exclusive jurisdiction of the federal courts. See id. at 370–71. In contrast to Matsushita, the interlocutory order of the North Carolina Superior Court Judge is not a judgment entitled to full faith and credit in federal court. Moreover, a class certification order is not a judgment that is entitled to preclusive effect. See, e.g., In re Gen. Motors

_____

[28] 28 U.S.C. § 1738 provides:

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

[29] The North Carolina Superior Court Judge disclaimed that the interlocutory order was "binding" on this court. See State Court Order [D.E. 252-2] ¶ 125.

66

Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 134 F.3d 133, 146 (3d Cir. 1998). Likewise, collateral interlocutory orders, such as the one the North Carolina Superior Court Judge issued on January 17, 2018, are not binding on this court pursuant to 28 U.S.C. § 1738. See, e.g., In re Diet Drugs, 282 F.3d 220, 240 (3d Cir. 2002). Furthermore, well-established principles of federalism dictate that the North Carolina Superior Court Judge had no authority to bind this federal court to his opinions about a proposed class settlement pending in this federal court. See, e.g., Donovan, 377 U.S. at 412–13. Indeed, the North Carolina Superior Court Judge's interlocutory order is not even binding on him. See, e.g., In re Diet Drugs, 282 F.3d at 240; Miller v. Miller, 34 N.C. App. 209, 212, 237 S.E.2d 552, 555 (1977); Custard, 2010 WL 1035809, at *39.

Notably absent from both the objectors' arguments and the North Carolina Superior Court Judge's interlocutory order is any analysis of the merits of the underlying federal case, which is the most important factor in considering the fairness, reasonableness, and adequacy of the proposed settlement. The North Carolina Superior Court Judge's interlocutory order repeatedly cites the $76 million settlement offer made in the state court action in 2005 as evidence that the $24 million settlement in this federal action is not fair. See State Court Order [D.E. 252-2] ¶¶ 16–18, 83, 105, 110, 119; cf. Fed. R. Evid. 408 ("Evidence of [an offer of compromise] is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim.").[30] Putting aside both Federal Rule of Evidence 408 and North Carolina's materially indistinguishable Rule of Evidence 408, this twelve-year old settlement offer has little relevance to any fairness assessment

---

[30] The North Carolina Superior Court Judge's interlocutory order discusses settlement negotiations that occurred in 2007. See State Court Order [D.E. 252-2] ¶¶ 24–27. Objectors do not cite any such proposed settlement in their objections and no evidence suggests that the Wake County Superior Court held an approval hearing concerning any such proposed settlement offer. In any event, any such offer (even if made) is not admissible concerning "the validity or amount of a disputed claim." Fed. R. Evid. 408(a).

67

because the litigation risks have substantially changed in the Cooperative's favor since 2005, and the Cooperative's business strategy from 2005 to 2017 has proven reasonable and beneficial to the Cooperative's members. As for the litigation risk, the Cooperative litigated nearly identical claims in Georgia state court in Rigby and the plaintiffs lost every claim. The North Carolina Superior Court Judge's interlocutory order includes no legal analysis concerning the claims at issue in this case (or Fisher/Lewis) to substantiate the conclusion that this $24 million settlement is not fair, reasonable, and adequate. The North Carolina Superior Court Judge's interlocutory order also does not discuss the record in this federal case or cite any case that interprets or applies Federal Rule of Civil Procedure 23(e), which addresses the fairness, reasonableness, and adequacy of a proposed settlement.

The court recognizes that the Fisher/Lewis complaint asserts additional causes of action for conversion, breach of contract, imposition of constructive trust, accounting, ultra vires, and unfair trade practices. Nonetheless, counsel for Pender Farms failed to explain at the fairness hearing or anywhere else how including these additional causes of action would provide a route for the Fisher/Lewis plaintiffs to litigate that case through final judgment and final appeal and recover any greater relief than $24 million, given that each of these claims appears to rest on the same fundamentally flawed allegation that the Cooperative unlawfully retained reserves. See Rigby, 327 Ga. App. at 29–42, 755 S.E.2d at 918–26; Rigby, 339 Ga. App. at 561–64, 794 S.E.2d at 416–18.

In its brief, Pender Farms cites and quotes N.C. Gen. Stat. §§ 54-126, 54-127. See [D.E. 255] 22. Pender Farms, however, fails to explain how these statutes apply to the Cooperative or how these statutes provide a basis for relief. These statutes are contained within Subchapter IV of Chapter 54. The Cooperative, however, is organized under Subchapter V of Chapter 54, which governs cooperative marketing associations. See Am. Compl. ¶ 3; [D.E. 228] 17–18. Furthermore,

68

the Fisher/Lewis third amended complaint fails to cite any statutory authority that would allow any court to force the Cooperative immediately to distribute its reserves. See [D.E. 228-29] (Fisher/Lewis third amended complaint). Instead, the Fisher/Lewis third amended complaint merely states that "[p]ursuant to North Carolina statutory law, when a member/shareholder is expelled or removed from membership, [the Cooperative] is required to pay any amounts due for capital stock certificates of interest, reserves or other equity credits to such member/shareholders." Id. at 17. Yet, this allegation directly conflicts with the statutory language in N.C. Gen. Stat. § 54-136:

> Upon the death, withdrawal or expulsion of a member, the board of directors of the association shall, within one year, cause to be paid to such member or his estate one hundred percent (100%) of all amounts due him for any and all raw products which have been delivered by him to the association. **All other amounts which might be due for capital stock, certificates of interest, reserves or on account of any other equity credits shall be payable in accordance with the charter or bylaws of the association.**

N.C. Gen. Stat. § 54-136 (emphasis added). In light of this clear statutory language and the Cooperative's By-laws (which do not require immediate payment), Pender Farms never explains how any court could force the Cooperative immediately to pay reserves (reasonable or otherwise) to current or former members. See Lake Region Packing Ass'n, 327 So.2d at 215; Claassen, 208 Kan. at 131–34; 490 P.2d at 379–81; Evaneko v. Farmers Union Elevator, 191 N.W.2d 258, 260–62 (N.D. 1971) ("Thus it wil[l] be noted that the patronage credits constitute an interest of the patron in the cooperative which is contingent and not immediately payable. This interest becomes vested only when the board of directors, in the exercise of its sound discretion, determines that such payments can be made in cash without causing undue financial hardship to the cooperative."); Walker v. Oglethorpe Power Corp., 341 Ga. App. 647, 661–69, 802 S.E.2d 643, 661–64 (2017); Ga. Turkey Farms, Inc. v. Hardigree, 187 Ga. App. 200, 204, 369 S.E.2d 803, 806–07 (1988) ("Redemption of patronage allocations is a matter within the discretion of the directors of the co-operative. It is well

69

established that equity credits allocated to a patron on the books of a co-operative do not reflect an indebtedness which is presently due and payable by the co-operative to such patron." (quotation omitted)).

At the fairness hearing, this court asked counsel for Pender Farms to discuss the strength of plaintiffs' claims in Fisher/Lewis and Speaks and explain how plaintiffs in either case could recover anything approaching $24 million if they litigated to final judgment and final appeal. Counsel, however, offered no evidence and no legal authority to give the court any comfort concerning the plaintiffs' probability of recovering a single dollar in either the Speaks case or the Fisher/Lewis case if either case is litigated to final judgment and final appeal. See Fairness Hr'g Tr. at 57–67. Instead, counsel for Pender Farms argued that the original marketing agreements between the Cooperative and its members included a provision stating that the Cooperative's net gains, after a reasonable deduction for reserves, will be returned to members, and that this provision concerning reasonable reserves was removed from the marketing agreements in 1985. See id. at 62; see also [D.E. 228-31] (1946 marketing agreement). Thus, according to counsel for Pender Farms, the Cooperative's post-1985 marketing agreements have an "implied term" based on "course of dealing" to retain only "reasonable reserves," and the Cooperative violated that provision after 1985 by retaining unreasonable reserves. See Fairness Hr'g Tr. at 62–63.

The argument faces four profoundly significant obstacles. First, plaintiffs seek the Cooperative's reserves based on an alleged breach of contract due to a 1985 change to the marketing agreements. The statute of limitations for a breach of contract claim under North Carolina law, however, is three years, and it starts to run from the date of the alleged breach. N.C. Gen. Stat. § 1-52(1); see Penley v. Penley, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985) ("The statute begins to run on the date the promise is broken."). Thus, the statute of limitations appears to have barred any such

70

implied contract claim long ago. See Rigby, 327 Ga. App. at 38–39, 755 S.E.2d at 923–24.

Second, to the extent that counsel for Pender Farms alleges that there is an implied contract between the Cooperative and its members that requires the Cooperative to distribute anything in excess of "reasonable reserves," "where there is an express contract between parties, there can be no implied contract between them covering the same subject matter dealt with in the express agreement." Snyder v. Freeman, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980); see Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713–14, 124 S.E.2d 905, 908 (1962); Mancuso v. Burton Farm Dev. Co., 229 N.C. App. 531, 536–37, 748 S.E.2d 738, 743 (2013). Since the Cooperative's inception, both the Articles of Incorporation and By-laws have provided it with express authority to maintain capital reserves, without limitation. See [D.E. 229-2, 229-3]. A court applying North Carolina law would very likely conclude that the Cooperative's By-laws constitute an express written agreement between the Cooperative and its members. See, e.g., Coop. Warehouse v. Lumberton Tobacco Bd. of Trade, 242 N.C. 123, 134, 87 S.E.2d 25, 32 (1955); Bright Belt Warehouse Ass'n v. Tobacco Planters Warehouse, 231 N.C. 142, 146, 56 S.E.2d 391, 394 (1949); Cape Hatteras Elec. Membership Corp. v. Stevenson, 2015 NCBC 34, 2015 WL 1602080, at *5 (N.C. Super. Ct. Apr. 9, 2015) (unpublished), aff'd, 790 S.E.2d 675, 679–80 (N.C. Ct. App. 2016). Thus, the chances that any court applying North Carolina law would find an implied contract that conflicts with the By-laws' express terms is minuscule.

Third, to the extent counsel for Pender Farms argues that either the By-laws or the marketing agreements contain an "implied term" concerning the distribution of anything in excess of "reasonable reserves," counsel for Pender Farms has failed to explain why any court applying North Carolina law would find any implied term in the marketing agreements, By-laws, or anywhere else. Under North Carolina law, courts find implied terms when, based on the circumstances, "the parties

must have intended the stipulation in question." Lane v. Scarborough, 284 N.C. 407, 410, 200 S.E.2d 622, 625 (1973) (quotation omitted); see Shelton v. Duke Univ. Health Sys., Inc., 179 N.C. App. 120, 123–24, 633 S.E.2d 113, 115–16 (2006). However, since the Cooperative's inception, both the Articles of Incorporation and By-laws have provided it with express authority to maintain capital reserves, without limitation. See [D.E. 229-2, 229-3]. The Cooperative's Board has consistently taken the position that the Cooperative can retain net gains as reserves to support its members and ongoing operations. The Cooperative's Board has been forthcoming to its members about this position and consistently informed members of its decision to retain net gains as reserves. See, e.g., [D.E. 229-4] (1975 newsletter); [D.E. 229-10] (1990 newsletter). The Cooperative's consistent and visible decisions concerning how to employ net gains destroy any argument that some implied term exists based on the Cooperative's "course of dealing." See, e.g., Lane, 284 N.C. at 410, 200 S.E.2d at 624–25; Duke, 179 N.C. App. at 123–124; 633 S.E.2d at 115–16. Moreover, to the extent counsel for Pender Farms argues that the Cooperative was required to distribute anything in excess of "reasonable reserves" to members based on "usage of trade," this claim also appears to be similarly weak. See, e.g., Lake Region Packing Ass'n, 327 So.2d at 214–17; Claassen, 208 Kan. at 131–34, 490 P.2d at 379–81.

Fourth, while counsel for Pender Farms continues to assert that the Cooperative's reserves are unreasonable, counsel for Pender Farms fails to offer any evidence to support this argument. Indeed, even though counsel filed the Fisher/Lewis action in 2005 and even though counsel has been engaged in merits discovery for approximately one year, the Fisher/Lewis expert, Dr. Harrison, testified that plaintiffs' counsel in Fisher/Lewis has never asked him to calculate what reasonable reserves would be. See Harrison Dep. at 96, 151–58. Dr. Harrison also testified that he was not informed of the Cooperative's successful litigation in Rigby. See id. at 89–91. Having thoroughly

reviewed the record in this case, this court seriously doubts that plaintiffs in Fisher/Lewis or plaintiffs in Speaks could prove that the Cooperative's reserves are unreasonable and must immediately be disgorged in cash to the plaintiffs.

Hope is a wonderful virtue. Hope is not a wonderful litigation strategy when considering whether to litigate a case to final judgment and final appeal. Rather, a wonderful litigation strategy arises when the governing law and compelling evidence favor your client's litigation position. When they do not, a lawyer appropriately heeds the timeless wisdom of Abraham Lincoln:

> Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser—in fees, expenses and waste of time. As a peacemaker the lawyer has a superior opportunity of being a good [person]. There will still be business enough.

Abraham Lincoln, Notes for a Law Lecture (July 1, 1850) in 2 Collected Works of Abraham Lincoln 81 (2001). Having considered the fairness, reasonableness, and adequacy of the proposed settlement, including all factors that the Fourth Circuit described in Berry, 807 F.3d at 614, and In re Jiffy Lube, 927 F.2d at 159, the court finds that the proposed settlement is fair, reasonable, and adequate.

## C.

The court also must consider whether the distribution plan of the settlement fund meets the standards of fairness, reasonableness, and adequacy. See In re Chicken Antitrust Litig. Am. Poultry, 669 F.2d 228, 238 (5th Cir.1982); In re Mills Corp. Secs. Litig., 265 F.R.D. 246, 258 (E.D. Va. 2009). "The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." In re Mills, 265 F.R.D. at 258; see Cobbell v. Salazar, 679 F.3d 909, 918–19 (D.C. Cir. 2012); Sullivan v. DB Inv., Inc., 667 F.3d 274, 326 (3d Cir. 2011). The distribution plan is fair, reasonable, and adequate to all class members. The distribution plan takes into account the varying

73

circumstances of class members both by volume of tobacco sold, and by number of years in which members sold tobacco to the Cooperative. The distribution plan ensures that both small and large member-farmers can receive compensation, but it reserves the higher payouts for member-farmers who sold more tobacco to the Cooperative. In opposition, Pender Farms contends that the distribution plan is unfair because there is an alleged conflict between members whose tobacco produced gains and those members whose tobacco did not produce gains. See [D.E. 192] 10. Under the litigation theory in Fisher/Lewis, however, class members who did not sell tobacco to the Cooperative in years in which there were net gains may recover nothing. See Fairness Hr'g Tr. at 47; Harrison Dep. at 195–98. Ironically, while Pender Farms vigorously argues that this proposed settlement is unfair to class members, Pender Farms acknowledges that many of the class members in Fisher/Lewis will recover nothing under the Fisher/Lewis litigation strategy.

Objectors raise numerous issues with the distribution plan. First, objectors argue that class members who submit claims first can get the majority of the funds. This assertion is incorrect because the claims administrator will pay out funds on a pro rata basis for all timely-filed claims. See [D.E. 217-6] 259–60. Dr. Harrison also opines that under the proposed method for apportioning the settlement, it is possible that the Group 1 claimants could exhaust all of the funds. See Affidavit of Glenn W. Harrison [D.E. 192-7] ¶ 11. This assertion is untrue. Only 75% of the settlement funds will be allocated to Group 1 claimants. See [D.E. 60-1] 12.

Objectors also contend that the distribution plan is unfair because they have no way of knowing whether submitting a Group 1 or Group 2 claim is more profitable. Claimants, however, can submit both Group 1 and Group 2 claims. Although the claim form does not clearly state that claimants can submit both Group 1 and Group 2 claims, the settlement website instructs claimants that they can submit both Group 1 and Group 2 claims and that they may receive payouts from both

Group 1 and Group 2 if they qualify.[31]  Moreover, the claims administrator will attempt to validate all claims as both Group 1 and Group 2 claims to ensure claimants receive the benefit of the Cooperative's records. See [D.E. 217-6] 256–57. Accordingly, the court rejects the arguments made concerning unfairness with the proposed distribution scheme.

### D.

Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  When a class is certified at the same time as settlement, the notice must also comport with the requirements of Rule 23(c)(2)(B). See, e.g., Fidel v. Farley, 534 F.3d 508, 513 (6th Cir. 2008).  Rule 23(c)(2)(B) requires that all class members be provided with "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); see Low v. Trump Univ., LLC, No. 17-55635, 2018 WL 718916, ——F.3d——, at *3 (9th Cir. Feb. 6, 2018).  The notice must include the following information, written in plain language: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B); see Decohen, 299 F.R.D. at 478 n.17.  Under Rule 23(c)(2)(B), "[t]he yardstick against which we measure the sufficiency of notices in class action proceedings is one of reasonableness." Low, 2018 WL 718916, at *5; see In re Bank of Am. Corp.

---

[31] See Speaks v. U.S. Tobacco Cooperative, Inc., No. 5:12-CV-729-Settlement Website, FAQ No. 47, https://fluecuredtobaccosettlement.com/mainpage/CommonlyAskedQuestions.aspx (last visited Feb. 20, 2018).

Sec. Derivative, & ERISA Litig., 772 F.3d 125, 132 (2d Cir. 2014).

Rule 23(e)(1) does not "spell out the required contents of the settlement notice." McLaurin, 2011 WL 13146422, at *5 (quotation omitted). Due process, however, requires that notice be "the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Phillips Petroleum Co., 472 U.S. at 812. The notice should describe, in neutral terms, the action, the terms of the proposed settlement, and class members' rights, including the right to opt-out. See id.; Grunin v. Int'l House of Pancakes, 513 F.2d 114, 122 (8th Cir. 1975); McLaurin, 2011 WL 13146422, at *5. Neither Rule 23 nor the Due Process Clause require the notice "set forth every ground on which class members might object to the settlement." Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Co., 497 F.3d 615, 630 (6th Cir. 2007); see Grunin, 513 F.2d at 122. "All that the notice must do is fairly apprise the prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests." Int'l Union, 497 F.3d at 630 (quotation omitted).

The requirements of Rule 23(c)(2)(B), (e)(1), and due process are met in this case. Class members were provided the with the best notice practicable under the circumstances. Specialists implemented the notice plan, and it provided individual notice to identifiable class members, and included a comprehensive media campaign to reach non-identifiable class members. See Wheatman 4th Decl. [D.E. 217-5] ¶¶ 1, 4–6.

Kinsella Media, LLC ("KM"), a nationally recognized advertising and legal notification firm that specializes in the design and implementation of notification programs to reach unidentified putative class members, designed the notice program. See id. ¶ 1. KM designed the notice program to reach as many class members as possible and includes three-parts: (a) postcard notices sent via

direct mail; (b) paid media notice through national and local publications—including internet, print, and television advertising; and (c) earned media coverage through a press release. See id. ¶¶ 4–6. Rust Consulting, Inc. ("Rust") assisted in implementing the direct mail program. Rust was provided with the names and last-known addresses of 823,606 class members. Over 95% of the last-known addresses were more than 25 years old. See Stinehart 2d Decl. [D.E. 217-6] ¶ 6. Rust then sent the data through a trace procedure using TransUnion to determine the number of deceased members and the number of outdated addresses. Through the trace procedure Rust obtained 150,406 viable mailing addresses and sent a direct mail notice to each of these addresses. See id. ¶¶ 6–7. The notice reached approximately 74.2% of potential class members. See Wheatman 4th Decl. [D.E. 217-5] ¶ 13.

The detailed notice clearly states: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). The direct mail notice and the publication notice provide summary information and direct members to the settlement website or a toll free number for more information. See id. ¶¶ 11, 28. The website includes a long form notice that includes all of the required information under Rules 23(c)(2)(B), (e), and due process, and provides additional details about the settlement such as how claims will be paid out and how the settlement affects the Fisher/Lewis action. See [D.E. 60-2] (long form notice). The website also, among other things, describes the legal rights of class members, allows for electronic claims filing, provides a list of important dates, and includes a list of 48 commonly asked questions and answers.

KM assessed whether reasonable means existed to identify the heirs and assigns of deceased

members. KM concluded that it was not possible to compile an accurate list of these individuals and decided it would be more effective to reach these individuals through a media campaign. See Wheatman 4th Decl. [D.E. 217-5] ¶ 14. The paid media campaign used both broad national media and targeted local and trade industry media. The media publications provided information concerning the subject of the litigation, the class definition, the legal rights of class members, and it directed readers to the settlement website for more information. See id. ¶ 17. The national media campaign included, for example, banner advertisements that appeared on Advertising.com, Conversant, Facebook.com, Radium One, Xaxis, and Yahoo!. See id. ¶¶ 17–21. The local media campaign included, for example, notice published once in the Sunday edition of 25 local newspapers within the five designated marketing areas and in the daily edition of 26 local newspapers in counties within the five designated marketing areas. See id. ¶¶ 24–27. The earned media program included a press release distributed on PR Newswire's US1 National Circuit and the Agriculture microlist on October 30, 2017. See id. ¶¶ 28–29.

Objectors make numerous objections concerning the notice program. First, objectors contend that the notice ambiguously states how the settlement affects the Fisher/Lewis class. See [D.E. 255] 3. The court rejects this argument.[32] The short form notice that was used for direct mailing and publication clearly states: "You may have seen information about the Lewis/Fisher Lawsuit in the North Carolina Superior Court that was certified as a class action. You can submit a claim even if you are a class member in the Lewis/Fisher Lawsuit. This Settlement will not become effective, and claims will not be paid, until the class claims in the Lewis/Fisher Lawsuit are discontinued or

---

[32] To the extent that the North Carolina Superior Court Judge believes that the notice in this case to the Fisher/Lewis class was misleading, this court disagrees. Cf. State Court Order [D.E. 252-2] ¶¶ 81–83, 103, 110, 112–14, 126.

dismissed." See [D.E. 60-4].[33]  The long form notice also clearly details how the Speaks action

affects the Fisher/Lewis action. See [D.E. 60-2] 4 (long form notice (section six)). The settlement

website, which is listed on the short form notice and the media publications, provides additional

information about the settlement and the Fisher/Lewis action and informs class members:

> The [Speaks action and the Fisher/Lewis action] are brought by two different sets of
> plaintiffs. However, because the factual allegations and claims overlap, if the
> settlement is approved, the class allegations in the Fisher/Lewis lawsuit may be
> stopped or discontinued. If this Settlement is approved, you may participate in this
> Settlement by the submission of a claim(s) even if you are a class member in the
> Fisher/Lewis lawsuit. This Settlement will not become effective, and claims will not
> be paid pursuant to the Settlement, unless and until the class claims in the
> Fisher/Lewis lawsuit are discontinued or dismissed.[34]

Moreover, class members did not receive notice about the two lawsuits at the same time. The

Fisher/Lewis notice program began on July 26, 2017, and ended on September 6, 2017. See

Cameron R. Azari Decl. [D.E. 192-1] ¶¶ 10–19. In the Speaks case, direct mail notices did not begin

until October 13, 2017, and the media campaign did not begin until October 28, 2017, which was

two days after the Fisher/Lewis opt-out deadline. See Shannon R. Wheatman 2d Decl. [D.E. 73-32]

¶ 16. The majority of the media outlets used in the Speaks notice program were different than the

media outlets used in the Fisher/Lewis notice program. See id. Furthermore, "[t]he standard is not

whether the notice could be written to avoid any 'possibility of conceivable injury' or

misunderstanding, but is one of reasonableness." Low, 2018 WL 718916, at *7; see Mullane v.

Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314–15 (1950).

---

[33] In contrast, the notice in the Fisher/Lewis action did not mention the Speaks action. See
[D.E. 192-1] 14–17.

[34] See Speaks v. U.S. Tobacco Cooperative, Inc., No. 5:12-CV-729-Settlement Website, FAQ
No. 36, https://fluecuredtobaccosettlement.com/mainpage/CommonlyAskedQuestions.aspx (last
visited Feb. 20, 2018).

Next, objectors argue that the objection process has been rushed and complicated. The court rejects this argument. The settlement website was launched on September 28, 2017, and direct mailing began on October 13, 2017, and ended on November 14, 2017.[35] Class members were then given until December 20, 2017, to object and/or opt-out. This process constitutes sufficient notice. See, e.g., In re Transpacific Passenger Air Transp. Antitrust Litig., 701 F. App'x 554, 556 (9th Cir. 2017) (per curiam) (unpublished); Air Lines Stewards & Stewardesses Ass'n v. Am. Airlines Inc., 455 F.2d 101, 108 (7th Cir. 1972).

Objectors also argue that the notice appears to require class members affirmatively to "opt-in" if they want to receive payment because they have to submit a claim to recover money. The court rejects this argument. It is common to require class members to submit a claim to recover money in a class action settlement. See, e.g., 4 William B. Rubenstein, Newberg on Class Actions § 12:15 (5th ed. 2017).

Objectors also contend that the objection process was not fair because of minor inconsistencies between the notice documents, the preliminary approval order, and a page on the settlement website. The long form notice states that class members should mail objections to the court, class counsel, and defense counsel. The court's preliminary approval order states that class members should mail objections to the court and claims administrator. See [D.E. 63] 8. The court recognizes this inconsistency. The court, however, has treated all objections sent to the clerk of court as timely even if the objection was not also sent to class counsel and defense counsel. Thus,

_____

[35] Rust inadvertently sent the direct mail notices to the addresses that the Cooperative provided, instead of using the updated addresses gathered through the tracing procedure. See Jason Stinehart 1st Decl. [D.E. 83-1] ¶ 7. Rust then remailed all direct mail notices in three batches. On October 27, 2017, Rust remailed 9,167 notices. On November 10, 2017, Rust remailed 53,184 notices. On November 14, 2017, Rust re-mailed 88,055 notices. See id. ¶ 9.

this inconsistency has not prejudiced any objectors.[36]   Accordingly, the notice was reasonably

calculated to convey the required information. See, e.g., Low, 2018 WL 718916, at *7 ("[E]ven if

the notice in this case was not perfect . . . it was of such nature as reasonably to convey the required

information." (quotation, alteration, and citation omitted)).

E.

This final approval order and accompanying final judgment are binding on all parties and

settlement class members who have not been timely excluded from the settlement class. See

Matsushita Elec. Indus., 516 U.S. at 379; In re MI Windows, 860 F.3d at 223–25. This final

approval order and accompanying final judgment, however, do not address how the Wake County

Superior Court should proceed with the claims of the 84 individuals and entities who opted out of

the Speaks settlement class.

V.

In sum, after considering the substantial benefits that the $24 million settlement will provide

to the settlement class, as well as the factors described in this final approval order, the court finds

that the settlement is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e).

Accordingly, the court GRANTS plaintiffs' motion for final approval of this class action settlement

[D.E. 216]. The court also GRANTS plaintiffs' and defendant's motion to strike class-wide opt-outs

[D.E. 234, 245], DENIES defendant's motion to strike objections filed by Pender Farms [D.E. 236],

and DENIES plaintiffs' motion to exclude testimony of Glenn W. Harrison [D.E. 240]. Class

counsel SHALL communicate with the settlement class and advise the settlement class of this final

---

[36] There was also a typographical error on one page of the settlement website that listed the opt-out deadline as December 2018 rather than December 2017. The deadline was correctly listed on all other pages of the website and on all physical notice materials. The error was corrected in a timely manner, and there is no evidence that anyone has misunderstood the deadline.

81

approval order and the accompanying final judgment. Class counsel SHALL continue to communicate with the settlement class concerning further proceedings and the settlement process. The court also ORDERS class counsel to post a copy of this final approval order and the final judgment on the settlement website with a statement that, "The United States District Court for the Eastern District of North Carolina has approved the class action settlement. Any class member seeking relief must submit a Group 1 claim, a Group 2 claim, or claims under both Group 1 and Group 2 no later than May 26, 2018. The settlement website describes how to submit claims." The court will enter a final judgment consistent with this order.

SO ORDERED. This 20 day of February 2018.

JAMES C. DEVER III
Chief United States District Judge

82