IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:12-CV-729-D

TERESA M. SPEAKS, TOBY SPEAKS, )
STANLEY SMITH, EDDIE BROWN, )
ROBERT POINDEXTER, MIKE MITCHELL, )
ROY L. COOK, ALEX SHUGART, )
H. RANDLE WOOD, ROBIN ROGERS, )
and DANIEL LEE NELSON, )
                                  )
              Plaintiffs,         )
                                  )
         v.                       )   **ORDER**
                                  )
U.S. TOBACCO COOPERATIVE, INC. f/k/a )
FLUE-CURED TOBACCO COOPERATIVE )
STABILIZATION CORPORATION, )
                                  )
              Defendant.          )

On July 26, 2019, U.S. Tobacco Cooperative, Inc. (the "Cooperative" or "defendant") moved to dismiss plaintiffs' amended and supplemental class action complaint [D.E. 321] and filed a memorandum in support [D.E. 322]. On August 16, 2019, plaintiffs responded in opposition [D.E. 323]. On September 6, 2019, the Cooperative replied [D.E. 325]. As explained below, the court grants the Cooperative's motion to dismiss and dismisses the amended complaint.

I.

The parties are familiar litigants. In a previous order, the court discussed at length the Cooperative's history, the flue-cured tobacco industry, and the effect of the Fair and Equitable Tobacco Reform Act. See [D.E. 267] 3–17. The court incorporates that discussion by reference.

From 2013 to 2018, flue-cured tobacco farmers experienced a decline in both revenues and profits. See Am. Compl. [D.E. 320] ¶ 67. Additionally, flue-cured tobacco farmers and the flue-

cured tobacco industry today face numerous challenges. The capital-intensive nature of modern tobacco farming has led farmers to reduce the size of their work forces. See id. at ¶ 68. Consumer demand for tobacco products has fallen. See id. at ¶ 69. Moreover, federal, state, and local governments are increasing regulations on the tobacco industry. See id. at ¶ 71. For example, the United States Center for Disease Control revamped its guidance concerning tobacco control programs to reduce use of tobacco. See id. at ¶ 72. The Food and Drug Administration ("FDA") issued guidance concerning the prevention of 12 to 17 year-old's use of tobacco. See id. The FDA also extended its oversight authority concerning tobacco products, and issued a final rule requiring a graphic health warning on cigarette products. See id. at ¶¶ 76, 78. Congress passed the Patient Protection and Affordable Care Act, which provides a benefit to individuals who quit smoking. See id. at ¶ 74. In 2014, the National Institute of Health issued a publication that discussed health benefits of raising the age at which an individual can purchase tobacco to 21. Seven states and 440 local governments have adopted this recommendation. See id. at ¶ 75. Beginning in 2012, 37 states and the District of Columbia increased cigarette taxes. The tax increases, along with local government limits on tobacco advertising and public smoking of tobacco, decrease demand for tobacco. See id. at ¶¶ 79, 99.

The flue-cured tobacco industry also faces challenges in the international tobacco markets. After the end of the Tobacco Price Support Program, the tobacco industry relied more heavily on exports. In 2004, exports accounted for approximately 46% of revenues in the tobacco industry. In 2018, exports were 63% of tobacco industry revenues. See id. at ¶¶ 88–90. U.S. tariffs and the monetary exchange rate have decreased demand from international buyers of tobacco from the Cooperative. See id. at ¶¶ 96–97. China was a particularly important market for the Cooperative. In 2018, the Cooperative was made aware that any further purchases from China were suspended.

The decrease in demand for U.S. tobacco from China led to an 80% decrease in Cooperative contract volume and the closure of two Cooperative marketing centers. See id. at ¶¶ 91–92, 94.

Additionally, U.S. tobacco farmers face challenges to their market share from alternative products and tobacco importers. Electronic cigarettes, produced and imported from India, China, and other Eastern European countries, use "dark" tobacco and burley tobacco, not flue-cured tobacco. See id. at ¶ 101. Additionally, Congress passed legislation requiring 75% of tobacco in U.S. manufactured cigarettes to be grown in the United States (the "Tariff Rate Quota"). The Tariff Rate Quota increased imports of cheaper, international tobacco to the United States. Specifically, use of imported tobacco in U.S. manufactured cigarettes increased between 13% to 55%. See id. at ¶¶ 112–113.

> On February 13, 2019, the Cooperative sent a letter to Cooperative members that stated:
>
> Current market conditions and tremendous uncertainty in the export markets for the pending 2019 crop year have forced the Cooperative to make an approximate 80% reduction in leaf purchases from its 2018 contracted poundage. The impact of this decision has enormous consequences for our leaf business and more importantly for our member growers' tobacco production and financial wellbeing.
>
> Since it is the Cooperative's desire and intent to maintain our membership and for each member grower to retain their right to be members, all member growers will be given a choice to grow and sell or to not sell their contracted pounds to the Cooperative for crop year 2019. As you know, all tobacco sold by a member grower under contract to the Cooperative must be grown by that member. By signing the 2019 Marketing Agreement, the member grower is eligible for membership for the 2020 crop, even if the member grower chooses not to sell to the Cooperative in 2019. The member grower will indicate his or her choice by electing to grow and sell or to not sell to the Cooperative when signing their 2019 Marketing Agreement.

Id. at ¶ 114.

Plaintiffs allege that Cooperative members do not have another market in which the members can sell tobacco that the Cooperative does not purchase. See id. at ¶¶ 115, 130. Furthermore, the Cooperative's strategy extends the Cooperative's benefits to some Cooperative members, not all

3

members. See id. at ¶ 129. The plaintiffs attribute the Cooperative's choice to buy tobacco from some Cooperative members, but not others, to the Cooperative's or other processor's buying preferences. See id. at ¶ 119. Plaintiffs also allege that the Cooperative has not "broadened its market share for flue-cured tobacco so as to provide both a market and stable price for the flue-cured tobacco that its Members could produce." Id. at ¶ 125.

Plaintiffs allege that the Cooperative's efforts to vertically integrate its business have failed because the Cooperative members have not received the economic benefits associated with Cooperative membership. Specifically, the Cooperative "is not capable of providing direct economic benefit to its current or former Members[,] . . . has not been able to combat the market power" of big tobacco companies, and cannot control the increased regulation and taxing of tobacco. Id. at ¶ 122; see id. at ¶¶ 81–83, 120–21, 123. Additionally, the Cooperative is not using the Cooperative capital reserves to help flue-cured tobacco farmers to "compete and stabilize prices" or to bolster the "market strength" and to "improve[]" the business of those farmers. Id. at ¶ 132. The Cooperative has used the Cooperative reserves to finance purchases of tobacco from Cooperative members, but the Cooperative cannot purchase all tobacco the Cooperative members "can and want to grow." Id. at ¶¶ 85–87. Moreover, the Cooperative purchased this tobacco from its members even though the Cooperative knew that it could not currently resell the crop. Rather, plaintiffs allege that it can take approximately three years for the Cooperative to resell. See id.

In sum, plaintiffs allege that, due to market forces, the Cooperative can no longer achieve its central purpose of providing market stability to flue-cured tobacco farmers. See id. at ¶¶ 127–28, 152. Alternatively, plaintiffs allege that the Cooperative members' known or assumed expectations concerning the Cooperative are frustrated. See id. ¶ 153. Accordingly, plaintiffs seek judicial dissolution of the Cooperative and declaratory relief. See id. at ¶¶ 148–55.

4

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiffs' allegations must "nudge[] [her] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016). Additionally, a court may take judicial notice of public records

5

when evaluating a motion to dismiss for failure to state a claim. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

The motion to dismiss requires the court to consider plaintiffs' state-law claim against the Cooperative, and the parties agree that North Carolina law applies. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[1] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[1] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

6

A.

The Cooperative argues that, although plaintiffs' amended complaint contains a judicial dissolution claim under N.C. Gen. Stat. § 55A-14-30 (i.e., the non-profit judicial dissolution statute), the for-profit judicial dissolution statute, N.C. Gen. Stat. § 55-14-30, applies, and plaintiffs fail to plausibly allege any ground for dissolution under section 55-14-30. See [D.E. 322] 25–31. The Cooperative's argument presents two, related questions: (1) whether the judicial dissolution provision concerning for-profit corporations (section 55-14-30) or nonprofit corporations (section 55A-14-30) governs plaintiffs' judicial dissolution claim; and (2) whether plaintiffs state a claim under the relevant judicial dissolution provision.

1.

As for whether section 55-14-30 applies, the Cooperative is organized under the Cooperative Marketing Act of the State of North Carolina ("Marketing Act") with capital stock. See [D.E. 322-1] 2; Am. Compl. ¶ 23; N.C. Gen. Stat. § 54-129 et seq. The Marketing Act does not explicitly provide for judicial dissolution. Judicial dissolution claims, however, are governed by statute. See, e.g., Brady v. Van Vlaanderen, 261 N.C. App. 1, 4–5, 819 S.E.2d 561, 564 (2018); Foster v. Foster Farms, Inc., 112 N.C. App. 700, 711, 436 S.E.2d 843, 850 (1993). Section 54-142 of the Marketing Act states that

> [t]he provisions of the North Carolina Business Corporation Act (Chapter 55 of the General Statutes) shall apply, so far as appropriate, to every cooperative association with capital stock heretofore or hereafter organized or domesticated under this Subchapter, except where the provisions of that act are in conflict with or inconsistent with the express provisions of this Subchapter.

N.C. Gen. Stat. § 54-142 (emphasis added); see id. § 54-138 ("Any provisions of law which are in conflict with this Subchapter shall not be construed as applying to the associations herein provided for."). In contrast, the North Carolina Nonprofit Corporation Act applies to a "cooperative

7

association without capital stock." N.C. Gen. Stat. § 54-142.1 (emphasis added).

The parties do not identify, and this court's research did not reveal, a North Carolina appellate case applying either section 55-14-30 or section 55A-14-30 in a judicial dissolution action concerning a cooperative association. Accordingly, this court must predict which statute the Supreme Court of North Carolina would apply in this case.

Under North Carolina law, "[i]f the language of a statute is unambiguous," the court must "give effect to the plain meaning of the words without resorting to judicial construction." State v. Fields, 374 N.C. 629, 633, 843 S.E.2d 186, 189–90 (2020) (quotation omitted); see Meza v. Div. of Soc. Servs., 364 N.C. 61, 66, 692 S.E.2d 96, 100 (2010); Burgess v. Your House of Raleigh, Inc., 326 N.C. 205, 209, 388 S.E.2d 134, 136–37 (1990). The court must "presume that the General Assembly carefully chose each word used in drafting the legislation." Dickson v. Rucho, 366 N.C. 332, 344, 737 S.E.2d 362, 371 (2013) (quotation omitted). If a statute is ambiguous, the court must determine the intent of the North Carolina General Assembly and construe the statute to effect that intent. "This intent must be found from the language of the act, its legislative history and the circumstances surrounding its adoption which throw light upon the evil sought to be remedied." Burgess, 326 N.C. at 209, 388 S.E.2d at 137 (quotation omitted); see Dickson, 366 N.C. at 339–40, 737 S.E.2d at 368.

This court predicts that the Supreme Court of North Carolina would hold that section 55-14-30 governs plaintiffs' judicial dissolution claim. Because the Cooperative was organized with capital stock, section 55A-14-130 (i.e., the nonprofit corporation judicial dissolution statute) does not apply. See N.C. Gen. Stat. § 54-142.1; Fields, 2020 WL 3026040, at *3–4; Meza, 364 N.C. at 66, 692 S.E.2d at 100; Burgess, 326 N.C. at 209, 388 S.E.2d at 136–37. Rather, section 55-142 unambiguously directs the court to apply North Carolina Business Corporation Act ("NCBCA").

8

See id. § 54-142. Thus, section 55-14-30 applies to plaintiffs' judicial dissolution claim.

In applying section 55-14-30 to plaintiffs' judicial dissolution claim, the court recognizes that the Marketing Act is silent concerning judicial dissolution. See, e.g., Brady, 261 N.C. App. at 4–5, 819 S.E.2d at 564; Foster, 112 N.C. App. at 711, 436 S.E.2d at 850. However, a judicial dissolution claim must have a statutory basis, and applying section 55A-14-130 would not only contradict the text of sections 55-129, 55-142, and 55-14-30, but also create an exception to the statutory scheme that the North Carolina General Assembly did not provide. See, e.g., Sara Lee Corp. v. Carter, 351 N.C. 27, 36, 519 S.E.2d 308, 313 (1999). Although plaintiffs identify several provisions of the Marketing Act that arguably conflict with the NCBCA, plaintiffs do not argue that section 55-14-30 presents such a conflict, and the North Carolina courts are silent on the issue. Cf. [D.E. 323] 14–22. Accordingly, this court predicts that the Supreme Court of North Carolina would apply section 55-14-30 to plaintiffs' judicial dissolution claims.

In opposition, plaintiffs argue that applying section 55-14-30 conflicts with the Cooperative's limited purpose under N.C. Gen. Stat. § 54-129 and with the structural differences between cooperatives and for-profit corporations. The structural differences that plaintiffs identify include restrictions on the Cooperative's power, restrictions on ownership of property, restrictions on stock transfer, favorable tax treatment, exemptions from anti-trust regulations, and relaxed standards of conduct for cooperative directors. See [D.E. 323] 14–22. Plaintiffs also argue that the North Carolina General Assembly expressly could have limited a cooperative's members to proceeding with a judicial dissolution claim under section 55-14-30 but did not. See id. at 20.

The court rejects plaintiffs' arguments. First, the court rejects plaintiffs' appeal to section 54-129. Section 54-129 discusses why the General Assembly enacted the Marketing Act. Section 54-129 states, in full: "In order to promote, foster, and encourage the intelligent and orderly

9

producing and marketing of agricultural products through cooperation, and to eliminate speculation and waste, and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer, and to stabilize the marketing problems of agricultural products, this Subchapter is enacted." Id. In contrast, section 54-132, entitled "Purposes," states:

> [a]n association may be organized to engage in any activity in connection with the producing, marketing or selling of the agricultural products of its members and other farmers, or with the harvesting, preserving, drying, processing, canning, packing, storing, handling, shipping, or utilization thereof, of the manufacturing or marketing of the by-products thereof; or in connection with the manufacturing, selling, or supplying to its members of machinery, equipment, or supplies; or in the financing of the above-enumerated activities; or in any one or more of the activities specified herein.

N.C. Gen. Stat. § 54-132. Plaintiffs do not explain how applying section 55-14-30 is inappropriate in light of section 54-132. It is not.

As for plaintiffs' arguments concerning structural differences of cooperatives, the fact that some provisions of the Marketing Act are inconsistent with the NCBCA bespeaks only the General Assembly's purpose for creating the cooperative form. See N.C. Gen. Stat. § 54-132. Those differences do not establish section 55-14-30's inconsistency with the Marketing Act, and do much to demonstrate that the General Assembly knew how to distinguish cooperatives from for-profit corporations. See Town of Pinebluff v. Moore Cty., 374 N.C. 254, 256, 839 S.E.2d 833, 835 (2020); Ridge Cmty. Inv'rs, Inc. v. Berry, 293 N.C. 688, 695, 239 S.E.2d 566, 570 (1977) ("In ascertaining [the Legislature's] intent, it is always presumed that the Legislature acted with full knowledge of prior and existing law."). As for judicial dissolution, the General Assembly explicitly provided that section 55-14-30 should govern cooperatives with capital stock where the Marketing Act is silent. See N.C. Gen. Stat. § 54-142. Section 54-142 is unambiguous. Thus, this court looks no further than the text of the relevant statutes. See Fields, 2020 WL 3026040, at *3–4; Meza, 364 N.C. at 66,

10

692 S.E.2d at 100; Burgess, 326 N.C. at 209, 388 S.E.2d at 136–37. Accordingly, section 55-14-30 applies to plaintiffs' judicial dissolution claims.

2.

Under section 55-14-30, a court may dissolve a corporation in a shareholder action if:

> (i) the directors or those in control of the corporation are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock;
> (ii) liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder;
> (iii) the shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired;
> (iv) the corporate assets are being misapplied or wasted; or
> (v) a written agreement, whether embodied in the articles of incorporation or separate therefrom, entitles the complaining shareholder to liquidation or dissolution of the corporation at will or upon the occurrence of some event which has subsequently occurred, and all present shareholders, and all subscribers and transferees of shares, either are parties to such agreement or became a shareholder, subscriber or transferee with actual notice thereof

N.C. Gen. Stat. § 55-14-30. Additionally, "[t]he decision whether to grant dissolution is within the trial court's discretion even though grounds for dissolution are found to exist under the statute." Foster, 112 N.C. App. at 706, 436 S.E.2d at 847; see Brady, 261 N.C. App. at 4, 819 S.E.2d at 563; Royals v. Piedmont Elec. Repair Co., 137 N.C. App. 700, 704, 529 S.E.2d 515, 518 (2000). In Meiselman v. Meiselman, 309 N.C. 279, 307 S.E.2d 551 (1983), the Supreme Court of North Carolina noted that judicial dissolution statutes provided an equitable remedy for minority shareholders—traditionally, a class with few levers of power in the corporate structure—who complained of certain corporate shortcomings that hurt a member of the minority class. See Meiselman, 309 N.C. at 288–96, 307 S.E.2d at 557–61; 1 Russell M. Robinson, Robinson on North Carolina Corporation Law § 28.10 (7th ed. 2019).

11

Even construing the facts and inferences therefrom in a light most favorable to plaintiffs, plaintiffs fail to state a claim for judicial dissolution under section 55-14-30. As for subsection (i) and (iii) of section 55-14-30, plaintiffs do not allege that the Cooperative's directors are deadlocked. Cf. [D.E. 267] 54. As for subsection (v), no written agreement provides a member the right to dissolve the Cooperative. See [D.E. 322-1, 322-2].

As for subsection (ii), plaintiffs allege in the amended complaint that "[l]iquidation is reasonably necessary for the protection of the rights or interest of the complaining members/shareholders." Am. Compl. ¶ 154(a). Specifically, plaintiffs assert that the Cooperative's members' interests are frustrated because the Cooperative conducts its activities "selectively, as a private, for-profit, stock corporation would operate." Am. Compl. ¶ 14. The plaintiffs allege that the Cooperative operates selectively because it works with "flue-cured tobacco farmers that are chosen to participate in the Cooperative's patronage activities, not all flue-cured tobacco farmers who wish to participate in those activities." Id. at ¶ 129.

Under subsection (ii) of section 55-14-30, plaintiffs must prove that "(1) [they] had one or more substantial reasonable expectations known or assumed by the other participants; (2) the expectation has been frustrated; (3) the frustration was without fault of plaintiff[s] and was in large part beyond [their] control; and (4) under all of the circumstances of the case plaintiff[s are] entitled to some form of equitable relief." Meiselman, 309 N.C. at 301, 307 S.E.2d at 564; see Brady, 261 N.C. App. at 4, 819 S.E.2d at 563–64.

Even viewing plaintiffs' allegations in the light most favorable to plaintiffs, plaintiffs fail to plausibly allege that the Cooperative acted "selectively" in opposition to members' expectations. Indeed, plaintiffs' allegations undermine this contention. Although plaintiffs allege that the Cooperative reduced contract volume by 80%, the Cooperative stated that it wanted "each member

12

grower to retain their right to be members," and gave "all member growers . . . a choice to grow and sell or to not sell their contracted pounds to the Cooperative for crop year 2019." Am. Compl. ¶ 114. Moreover, plaintiffs do not allege that members failed to receive contracts from the Cooperative, could not enter into contracts with the Cooperative, or that the Cooperative's contracts were selectively distributed among Cooperative members. To the extent that plaintiffs argue that the Cooperative selectively excludes non-members or former members, plaintiffs do not allege any facts that support an inference that plaintiffs expected those farmers to receive Cooperative contracts. Furthermore, such an expectation conflicts with the Cooperative's articles and bylaws—which limit the Cooperative's business operations activities with flue-cured tobacco farmers to Cooperative members—and the Cooperative's February 13, 2019, letter, and thus cannot be considered "reasonable." See [D.E. 322-1, 322-2]. To the extent plaintiffs argue that the Cooperative should buy more tobacco from members, plaintiffs' allegations again undermine their claim. Plaintiffs allege that "[t]he Cooperative purchased flue-cured tobacco from its Members within the past (3) years that it knows it cannot currently sell," and that the Cooperative's "stocks are sufficient to fill anticipated demand for years to come." Am. Compl. ¶¶ 85, 130. That the Cooperative should purchase more tobacco in light of these allegations is not a reasonable inference, much less a "substantial reasonable expectation." To the extent plaintiffs argue that the Cooperative "is not driving a fair price for all flue-cured tobacco growers, only a chosen few, and by itself, will never be able to do so," id. at ¶ 84 (quotation omitted), the statement is conclusory, and not supported by the well-pleaded facts. See Iqbal, 556 U.S. at 678–79; Giarratano, 521 F.3d at 302. Accordingly, plaintiffs fail to state a claim under subsection (ii) of section 55-14-30.

As for subsection (iv) of section 55-14-30, waste "entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person

13

might be willing to trade." Gao v. Sinova Specialties, Inc., 2016 NCBC 103, 2016 WL 7852490, at *12 (N.C. Super. Ct. Dec. 21, 2016) (unpublished); see Krieger v. Johnson, 2014 NCBC 13, 2014 WL 1759054, at *7 (N.C. Super. Ct. Apr. 30, 2014) (unpublished); Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997).[2] Essentially, plaintiffs allege that the Cooperative is powerless to eliminate "speculation and waste" of Cooperative assets due to current market conditions. Am. Compl. ¶¶ 122, 130, 148, 154. Specifically, plaintiffs allege that the Cooperative's efforts to vertically integrate have been "unsuccessful" and cannot succeed in light of permanent changes to market conditions. Id. at ¶ 122.

Even viewing the facts and inferences therefrom in a light most favorable to plaintiffs, plaintiffs fail to state a claim that the Cooperative's actions are wasteful. Notably, plaintiffs do not allege that any action the Cooperative employed to vertically integrate resulted in an unreasonable exchange of the Cooperative's assets. Likewise, plaintiffs do not allege that the Cooperative's contract purchases of flue-cured tobacco from members was wasteful. See Sinova Specialties, 2016 WL 7852490, at *12; Johnson, 2014 WL 1759054, at *7; Vogelstein, 699 A.2d at 336. As for plaintiffs' allegations concerning Cooperative's vertical-integration strategy, plaintiffs ask this court to infer that the market for tobacco is unalterably changed such that no strategy the Cooperative employs will ever be successful. That descriptive claim, however, is purely speculative. See Iqbal, 556 U.S. at 678–79; Giarratano, 521 F.3d at 302. Moreover, the argument does not advance plaintiffs' burden to plausibly allege that the Cooperative's assets are exchanged for disproportionately small consideration. See Iqbal, 556 U.S. at 678–79; Twombly, 550 U.S. at 570.

---

[2] North Carolina courts "often look to Delaware courts for guidance regarding unsettled business law issues." Corwin v. British Am. Tobacco PLC, 251 N.C. App. 45, 53, 796 S.E.2d 324, 331 (2016), rev'd on other grounds, 371 N.C. 605, 821 S.E.2d 729 (2018); see Wheeler v. Wheeler, 17 CVS 16248, 2018 WL 6133510, at *9 (N.C. Super. Ct. Nov. 18, 2018) (unpublished).

14

Accordingly, the court grants the Cooperative's motion to dismiss plaintiffs' judicial dissolution claim.[3]

Alternatively, even if plaintiffs plausibly allege facts to support the statutory requirements of section 55-14-30 (which they do not), plaintiffs do not plausibly argue why the court should exercise its discretion to grant the remedy plaintiffs seek. See Brady, 261 N.C. App. at 4, 819 S.E.2d at 563; Foster, 112 N.C. App. at 706, 436 S.E.2d at 847; Royals, 137 N.C. App. at 704, 529 S.E.2d at 518. Both "judicial experience and common sense" counsel that the claim plaintiffs pursue is not plausible in light of the equities drawn from the facts alleged. Iqbal, 556 U.S. at 679; see Meiselman, 309 N.C. at 297, 307 S.E.2d at 562 ("[T]he trial court, in deciding whether to grant relief, must exercise its equitable discretion, and consider the actual benefit and injury to all of the shareholders resulting from dissolution . . . ." (alteration and quotation omitted)); 1 Russell M. Robinson, Robinson on North Carolina Corporation Law § 28.10 (7th ed. 2019); cf. Foster, 112 N.C. App. at 711, 436 S.E.2d at 850. At bottom, plaintiffs complaint and injury is attributable not to the Cooperative, but to the invisible hand. The judicial dissolution provision, however, is meant to remedy inequities caused by the corporation. See, e.g., Meiselman, 309 N.C. at 288–301, 307 S.E.2d at 557–64. Moreover, members are benefitting from the Cooperative's vertical-integration strategies. See Am. Compl. ¶¶ 114, 125, 129. Dissolution ends those strategies, and thus the benefits to those members. Additionally, the distribution plaintiffs seek is untethered from the individual member's contribution to the Cooperative reserves. Cf. Sharp Farms v. Speaks, 917 F.3d 276, 297 (4th Cir. 2019) ("But as the Objectors assert, 'membership alone has never been the basis for any interest in Cooperative reserves. It has always been tied pro rata to a member's individual interest in either the

---

[3] In light of this conclusion, the court need not address defendant's arguments about dissipation of assets or the business judgment rule. See [D.E. 322 ] 16–24.

15

tobacco marketed [pre-1982] or the NNC assessment paid [post-1982].'" (alteration omitted)); id. ("As the Objectors' expert explained, the Speaks distribution plan 'actually takes money away from people who have contributed to net patronage interest' because 'the only way that you give money to the people who contributed zero—that have zero patronage interest is by taking a dollar away from people who have generated a patronage interest,' a result the expert characterized as 'fairly obviously inequitable.' (alterations omitted)); id. ("A settlement involving all Cooperative members would vitiate [the Fisher-Lewis class members' interest tied to patronage interest] through awarding noncontributing members a portion of the reserve funds that the Fisher-Lewis class created."). In sum, even viewing the facts and inferences therefrom in a light most favorable to plaintiffs, plaintiffs do not plausibly allege why the court would exercise its equitable discretion to grant plaintiffs' judicial dissolution claim.

B.

Alternatively, plaintiffs fail to state a claim for judicial dissolution under the non-profit judicial dissolution statute, section 55A-14-30. Under section 55A-14-30, a court may dissolve a corporation in a shareholder action if:

> a. The directors are deadlocked in the management of the corporate affairs, and the members, if any, are unable to break the deadlock;
> b. The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent;
> c. The members are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have, or would otherwise have, expired;
> d. The corporate assets are being misapplied or wasted; or
> e. The corporation is no longer able to carry out its purposes.

N.C. Gen. Stat. § 55A-14-30.

Plaintiffs allege that the Cooperative is not able to carry out its purposes. See Am. Compl. ¶¶ 14–15, 128–30, 137, 148, 154. Plaintiffs argue that the Cooperative "is not promoting, fostering,

16

and encouraging the intelligent and orderly producing and marketing of flue-cured tobacco through cooperation, as current, and Plaintiffs allege permanent, market conditions prohibit the Cooperative from doing so." [D.E. 323] 26 (quotation omitted); see id. at 22–27; N.C. Gen. Stat. § 54-129. Specifically, plaintiffs argue that the Cooperative has not achieved price supports or economic stabilization in the flue-cured tobacco market for its members, that the Cooperative's manufacturing facilities operation does not buy or sell all of the tobacco that its members produce, and that market forces (i.e., big tobacco's dominance in the market, regulation, taxation, public condemnation of tobacco, etc.) render the Cooperative powerless to achieve its purposes. See [D.E. 323] 22–27.

As discussed, plaintiffs' reliance on section 54-129 is incorrect. Both section 54-132 and the Cooperative's articles of incorporation permit the Cooperative to engage in any activity "involving or relating to . . . financing, marketing, selling, and/or distribution . . . of flue-cured tobacco." [D.E. 322-1] 2; see N.C. Gen. Stat. § 54-132. Plaintiffs' amended complaint does not plausibly allege that the Cooperative's efforts to vertically integrate, or any other activity, fail to achieve that purpose. On the contrary, plaintiffs acknowledge that the Cooperative is actively purchasing flue-cured tobacco from its members with cash from the Cooperative's reserves, and intends to purchase more tobacco. See Am. Compl. ¶¶ 85, 111, 114. Again, plaintiffs' allegations doom their claim. Plaintiffs acknowledge that the Cooperative has " aggressively attempted to seek export customers overseas, especially in China, launched its own cigarette brands, acquired distribution facilities, [and] constructed a 'green tobacco' storage facility and purported to 'maximize' the number of contracts with its members." Id. at ¶ 82. Moreover, the amended complaint confirms that, even accepting as true the numerous market challenges to the flue-cured tobacco industry, the Cooperative is actively carrying out its purpose through the activities described in plaintiffs' amended complaint. As for plaintiffs' arguments concerning market forces, the descriptive claim is speculative and untethered

17

from the central question of whether the Cooperative is carrying out its purposes. See Iqbal, 556 U.S. at 678–79; Giarratano, 521 F.3d at 302. Accordingly, the court grants the Cooperative's motion to dismiss plaintiffs' judicial dissolution claim.

Alternatively, even viewing the facts and inferences therefrom in a light most favorable to plaintiffs, plaintiffs do not plausibly allege why the court should exercise its discretion to grant to plaintiffs's judicial dissolution claim. The reasons discussed above concerning the for-profit judicial dissolution statute apply here with equal force. See Meiselman, 309 N.C. at 297, 307 S.E.2d at 562; 1 Russell M. Robinson, Robinson on North Carolina Corporation Law § 28.10 (7th ed. 2019); cf. Brady, 261 N.C. App. at 4, 819 S.E.2d at 563; Foster, 112 N.C. App. at 706, 436 S.E.2d at 847; Royals, 137 N.C. App. at 704, 529 S.E.2d at 518. Thus, the court grants the Cooperative's motion to dismiss plaintiffs' judicial dissolution claim.

III.

The Cooperative argues that plaintiffs' declaratory judgment claim duplicates plaintiffs' judicial dissolution claim and should be dismissed. See [D.E. 322] 30–31; Am. Compl. ¶¶ 144–55. Plaintiffs failed to respond to the Cooperative's argument.

Each issue on which plaintiffs request declaratory judgment is an issue underlying plaintiffs' judicial dissolution claim. Because the court dismisses plaintiffs' judicial dissolution claim, a declaratory judgment "would serve no useful purpose in clarifying and settling the legal relations in issue." Hanback v. DRHI, Inc., 647 F. App'x 207, 209–10 (4th Cir. 2016) (per curiam) (unpublished) (quotation omitted); see Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996); see also Smitherman v. Bayview Loan Serv., LLC, 727 F. App'x 787, 792 (5th Cir. 2018) (per curiam) (unpublished); In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir.1993). Accordingly, the court grants the Cooperative's motion to dismiss plaintiffs' declaratory judgment

18

claim.

## IV.

In sum, the court GRANTS the Cooperative's motion to dismiss [D.E. 321] and DISMISSES the amended complaint. Plaintiffs did not request an opportunity to file another amended complaint. Thus, the court DISMISSES WITH PREJUDICE the amended complaint. The clerk shall close the case.

SO ORDERED. This 15 day of September 2020.

JAMES C. DEVER III
United States District Judge